In the Matter of the Application for the Discipline of Thomas K. SCALLEN, an Attorney at Law of the State of Minnesota.

No. 47366.

Supreme Court of Minnesota.

July 14, 1978.

R. Walter Bachman, Jr., Administrative Director on Professional Conduct, Lawyers Professional Responsibility Bd., St. Paul, for appellant.

Henry E. Halladay and J. Marquis Eastwood, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, for respondent.

TODD, Justice.

Thomas K. Scallen, a licensed Minnesota lawyer, was convicted in Canada of the crimes of theft and publishing and circulating a false prospectus. The Board of Professional Responsibility, after conducting a hearing, recommended to this court that Scallen be disbarred. We accept the recommendation for discipline but amend the penalty to provide that Scallen be indefinitely suspended from the practice of law in Minnesota, with right to reapply for admission in 5 years.

Scallen was admitted to the practice of law in Minnesota in 1950. The first 5 years of his legal career were spent as a deputy attorney general for the State of Minnesota. Thereafter, he entered private practice and early in 1960 became involved with the operation of the Medical Investment Corporation (Medicor). His participation in Medicor's operations steadily increased until by 1964 he had altogether ceased the private practice of law. Medicor operated several small banks and was the owner of the "Ice Follies," a highly successful touring ice show. Scallen was the chief executive officer of Medicor, and although the corporation was publicly held, in practice he functioned as its sole decision maker.[1] The board of directors of Medicor generally accepted his operational decisions and long-range planning without question.

In 1969, Scallen, as a result of his work with the ice show, became aware of the availability of a National Hockey League franchise at Vancouver, British Columbia, Canada. The NHL had offered the Vancouver franchise to Northwest Sports Enterprises, Ltd., for the sum of $6 million. Northwest had declined the offer at that price. Scallen determined that the franchise would be a sound investment, and in order to take advantage of the offer made to Northwest, he arranged for Medicor to acquire 90 percent of Northwest's outstanding shares for a price of $2.8 million. Medicor lacked the funds to both purchase the Northwest stock and make the first of six annual $1 million installment payments to the NHL. To provide the necessary funds, Medicor borrowed $3 million from the Walter E. Heller Corporation of Chicago. The Heller note was due in full on June 18, 1970, roughly 6 months after its execution. Because of the urgency with which these funds were sought, the Heller loan was secured in a somewhat unusual manner, which in turn produced a relatively high effective interest rate on the loan.

Medicor subsequently consummated the purchase of Northwest, and Scallen proceeded to operate it much as he had operated Medicor—i. e., with minimum reliance on the board of directors. Medicor's operations suffered a severe cash-flow shortage in 1970, making timely repayment of the Heller note extremely troublesome. Ultimately, an extension of the note was obtained, and an interim consultant employed by Medicor was asked to make proposals for alleviating the working capital

1. While Scallen at one time owned 100 percent of Medicor's stock, his holdings totaled 10 to 15 percent of the outstanding shares during the period of time relevant to these proceedings.

shortage. In a memorandum directed originally to Scallen and later to Medicor's debenture holders, the consultant discussed the possibility of raising cash by making a public offering of Northwest securities and somehow transferring the offering proceeds to Medicor for repayment of the Heller loan. The memorandum specifically cautioned, however, that:

"It may be illegal to flow the proceeds of the Canadian offering up to the parent [Medicor] without either: (1) *Stating this in the prospectus, which would make the offering difficult to sell,* or (2) Merging Medicor into Northwest Sports or merging Northwest Sports into Medicor." (Italics supplied.)

Market conditions in the spring of 1970 precluded a public offering, and Scallen sought alternative means for refinancing the Heller loan. During this time, the new hockey club was on its way to becoming a financial success. Advance ticket sales for the 1970–1971 hockey season generated sufficient revenues to pay the club's initial debts but not nearly enough funds to repay the Heller debt. When market conditions improved in the fall of 1970, however, the possibility of a public offering was again pursued. Royal Securities Limited (a Canadian subsidiary of Merrill Lynch) agreed to underwrite the offering, and the preparation of the offering prospectus was begun. Scallen actively participated in the underwriting process and signed the completed prospectus on November 13, 1970.

In its final form, the prospectus offered for public sale 2,000 shares of Northwest treasury stock, 1,000 shares of the Northwest stock held by Medicor, and $2 million principal amount of 8½-percent convertible subordinated debentures. Under Canadian law, the prospectus was required to state the purpose for which the funds generated by the offering would be used. The Northwest prospectus represented that the offering proceeds would be utilized to retire a small debt and to make the 1971 annual franchise payment to the NHL. The remaining funds—approximately $2.4 million—were to be added to Northwest's working capital and kept available for possible expansion into other entertainment/recreation fields.

It is undisputed that the offering proceeds were not utilized as represented in the prospectus. Instead, Scallen arranged to have $3 million of the proceeds transferred to Medicor for the repayment of the Heller loan as follows: On December 8, 1970, the closing of the offering took place and Northwest was issued a check by the underwriters in the amount of $3,439,-052.34. These funds were deposited in a Northwest account at the Royal Bank of Canada in Vancouver. On December 15, 1970, the Royal Bank was instructed to transfer $3 million to the Bank of America in San Francisco for the account of the Bank of the South Pacific—a wholly-owned subsidiary of Medicor.[2] In exchange, the Bank of the South Pacific issued a 90-day certificate of deposit to Northwest, bearing an interest rate of 8½ percent.[3] The Bank of the South Pacific immediately "loaned" the $3 million to Medicor at an interest rate of 9½ percent. Medicor's promissory note was secured by its shares of Northwest and the stock of two other Medicor subsidiaries. The fair market value of this collateral was more than double the face amount of Medicor's promissory note. Medicor in turn used the proceeds of the loan from the Bank of the South Pacific to repay its debt to Heller.

The foregoing transaction was completed in accordance with Scallen's specific in-

---

**2.** The Bank of the South Pacific had been previously established by Medicor with an eye toward future investments in the South Pacific. At the time the Northwest transaction occurred, the bank was inactive, although it did maintain a small office and employed two persons. Scallen channeled the funds through the bank rather than directly to Medicor in the interest of enhancing the financial appearance of the bank. It is clear from the evidence that the bank was not established for the purpose of defrauding Northwest.

**3.** This was the only certificate of deposit the bank had ever issued, and indeed the only banking transaction in which it had ever been involved.

structions and without the knowledge of the directors of Northwest. However, no attempt was ever made to disguise the transaction, and it was readily discovered by Northwest's accountants. In the spring of 1971 when the other Northwest directors learned of the transaction and expressed their disapproval, Scallen made arrangements for Medicor to repay the $3 million to Northwest. These events generated substantial publicity in Vancouver and apparently brought the entire matter to the attention of the attorney general. Scallen and an associate were subsequently charged with the publication and circulation of a false prospectus. Scallen alone was also charged with theft.

Section 358 of the Canadian Criminal Code provides:

"(1) Every one who makes, circulates or publishes a prospectus, statement or account, whether written or oral, *that he knows is false in a material particular, with intent*

"(a) *to induce persons, whether ascertained or not, to become shareholders or partners in a company,*

"(b) to deceive or defraud the members, shareholders or creditors, whether ascertained or not, of a company,

"(c) to induce any person to entrust or advance anything to a company, or

\*     \*     \*     \*     \*     \*

is guilty of an indictable offence and is liable to imprisonment for ten years." (Italics supplied.)

The theft offense is defined at section 283 of the code:

"(1) Every one commits theft who fraudulently and without colour of right takes, or fraudulently and without colour of right, converts to his use or to the use of another person, anything whether animate or inanimate, with intent,

"(a) to deprive, temporarily or absolutely the owner of it or a person who has a special property or interest in it, of the thing or of his property or interest in it,

\*     \*     \*     \*     \*     \*

"(3) *A taking or conversion of anything may be fraudulent notwithstanding that it is effected without secrecy or attempt at concealment.*

"(4) For the purposes of this Act the question whether anything that is converted is taken for the purpose of conversion, or whether it is, at the time it is converted, in the lawful possession of the person who converts it is not material." (Italics supplied.)

Scallen's case was tried before a jury of 12 in Vancouver. With respect to the false prospectus charge, Scallen defended on the ground that the purpose-of-issue language in the prospectus was not false at the time when the prospectus was circulated. That is, Scallen argued that when the prospectus was signed, he did in fact intend to use the offering proceeds as stated in the prospectus, and only later developed the plan of transferring the funds to Medicor. In fairness to Scallen, there was some evidence which tended to support this contention. Testimony was adduced which indicated that just prior to the public offering, Northwest (i. e., Scallen) had conducted some preliminary negotiations for the purchase of "Holiday on Ice," another ice show.[4] The prospectus language referring to Northwest's possible expansion into other leisure entertainment fields would certainly encompass the acquisition of Holiday on Ice. Nevertheless, the jury disbelieved Scallen and found, pursuant to the trial judge's charge, that he had formed the intention to use the offering proceeds to pay off the Heller loan at the time he signed the prospectus. The document was thus knowingly false, and the jury found Scallen guilty of the securities fraud charge.[5]

---

4. Other testimony indicated that the Canadian directors of Northwest were uninterested in investing in an American ice show and preferred an investment in Canada.

5. We may infer that the jury rested its finding on the inculpatory memorandum (discussed above), the testimony of its author, Mr. Denny, and the testimony of Dean Hiserodt, a former vice president and comptroller of Medicor. Hiserodt stated that Scallen prohibited him

Concerning the theft charge, Scallen contended that he had not transferred the Northwest funds "without colour of right." He argued that as Northwest's chief executive officer, he had the authority to make such a transfer without express approval from the board of directors. He also contended that he had no intention of defrauding Northwest in any way. The judge explained the terms of the theft statute to the jury as follows:

"* * * If you find that he caused the money to be sent to the Bank of the South Pacific fraudulently and without colour of right, and thus committed theft, it matters not that he intended to have the money repaid or that he caused to be put up substantial collateral for its repayment or that the money was repaid without loss to Northwest. Good intentions, after a theft, do not change it from being a theft.

"There is another matter I wish to make very clear at this point. I said that the colour of right means an honest belief held by a person in a state of facts which, if it existed, would furnish a legal justification or excuse for the acts complained of. Now, the question is not whether his belief is reasonable. The question is whether his belief is an honest one. Someone may honestly believe in a state of facts while others may say that it was not reasonable for him to hold such a belief. Whether it was reasonable or not is not the question. It is whether he honestly believed.

"* * * It is clear from the evidence that the money in question was applied to the use of Medicor; that Northwest was temporarily deprived of that money; and, that it was all done on the instructions of the accused. If you are satisfied beyond a reasonable doubt that this was a fraudulent scheme conceived in and carried out by the accused. If you do not accept that it was a fraudulent scheme or if you had a reasonable doubt on the question, you must, I repeat, you must acquit him."

from speaking to Northwest's underwriters in connection with the prospectus, saying: "What they don't know won't hurt them."

Again, the jury rejected Scallen's professed legitimate intentions and found him guilty of theft. On April 13, 1973, the trial judge sentenced Scallen to concurrent 4-year sentences. Scallen appealed to the British Columbia Court of Appeals. That court unanimously dismissed the appeal[6] but did reduce Scallen's prison sentence to 2 years. The latter was actually incarcerated for only 9 months and was paroled in February 1975.

The Board of Professional Responsibility filed a petition for discipline on December 2, 1976. The matter was referred to the Honorable C. A. Rolloff as referee, and hearings were held before him. On November 28, 1977, Judge Rolloff issued findings and conclusions which provide in part:

"V.

"The facts leading to the conviction of Respondent of issuing a false prospectus would be similar as found under Minnesota (M.S. 80A.17 and 80A.220 [80A.22]). The facts leading to the defendant's conviction of theft would be similar under Minnesota Law 609.52.

"VI.

"The Respondent managed both Medicor and Northwest with little if any participation or consultation by the other members of the Board of Directors of either corporation. After the discovery by the directors of Northwest some months later that $3,000,000.00 of its money had been used to pay Medicor's debts to Heller the Respondent succeeded in borrowing sufficient money to pay back Northwest.

"VII.

"There is no evidence of any misconduct by the Respondent except the conduct herein described. A number of lawyers testified that Respondent was a man of good character.

6. The three-member panel delivered seriatim opinions. See, *Regina v. Scallen*, 4 W.W.R. 345 (1974).

## "CONCLUSIONS

### "I.

"That Respondent's conviction in British Columbia, Canada should be accepted as convictions in this proceedings.

### "II.

"The Respondent is guilty of violating a Rule of the Code of Professional Responsibility DR 1–102 (A), (1), (2), (3), (4), (5).

### "RECOMMENDATION

"That the Respondent Thomas K. Scallen be disbarred from the practice of law in the State of Minnesota."

On appeal, we are faced with the question of the effect to be given a criminal conviction entered against a Minnesota attorney by the courts of a foreign country. Scallen challenges the conclusiveness of his Canadian conviction in this disciplinary proceeding on grounds that (1) Minnesota disciplinary rules provided him with inadequate notice of the consequences attending a foreign criminal conviction; and (2) Canadian criminal procedure failed to accord him the substantial equivalent of American constitutional guarantees.

█ 1. Turning first to the question of notice, it is undisputed that when Scallen was convicted there was nothing in either the Code of Professional Responsibility or our rules governing disciplinary proceedings which was specifically addressed to criminal convictions in other countries. Indeed, the only mention of foreign crimes as of the date of this opinion is found in Rule 17(a) of the Rules on Lawyers Professional Responsibility. Rule 17(a) provides that interim suspension, pending a full-fledged disciplinary proceeding, may be imposed on a Minnesota attorney who has been convicted of a crime in the United States or elsewhere, where such crime is punishable by incarceration in excess of one year. Scallen urges that because foreign crimes were not expressly dealt with in any of our rules, he could not have had notice of the fact that crimes such as his could be made the basis for a recommendation of disbarment. As such, he argues, censure rather than disbarment constitutes the appropriate disciplinary sanction.

We emphatically reject Scallen's lack of notice contention on two grounds. First, when Scallen engaged in the activities which generated these proceedings, he was unquestionably subject to the Code of Professional Responsibility. DR 1–102 unambiguously provides:

"A lawyer shall not:

    *     *     *     *     *     *

"(3) Engage in illegal conduct involving moral turpitude.

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

Nothing in this language or elsewhere indicates that its effectiveness is restricted by political or geographic boundaries. It regulates the conduct of a Minnesota lawyer anywhere in the world. If any attorney's conduct violates the code, he is subject to discipline, and Scallen does not directly challenge this proposition. Since his conduct was illegal and at very least involved misrepresentation, we cannot accept the contention that Scallen was without notice of the code's full application to his conduct. In the words of Mr. Justice White in *In re Ruffalo*, 390 U.S. 544, 556, 88 S.Ct. 1222, 1229, 20 L.Ed.2d 117, 125 (1968), Scallen's conduct was not of the sort over which "responsible attorneys would differ in appraising [its] propriety."

Second, and more troubling, is the assumption which seems to underlie Scallen's position. In substance, he would have us construe the Code of Professional Responsibility in essentially the same manner as a criminal code. Under this rationale, a code of ethics must be strictly construed, and only that conduct which is unambiguously proscribed can be made the basis of disciplinary action. Attorneys would be free to do as they please, irrespective of moral dictates, so long as they stayed within the letter of the code. In accordance with this view, Scallen in essence asserts that because his misconduct—a foreign crime—is not expressly mentioned in the code, he should not be severely disciplined for the breach of the more general ethical duties established by DR 1–102.

■ Our perception of the function and interpretation of a code of ethics, however, is entirely at odds with Scallen's. The emphasis of an ethical code is on its spirit rather than its letter. And the fact that the disciplinary rules attempt to establish a reasonably precise boundary between ethical and unethical conduct does not support the proposition that they must be strictly construed so as to save putatively borderline conduct from meaningful sanction. Rather, members of the bar should steer the widest feasible course around conduct proscribed by the disciplinary rules.[7] We are thus entirely unimpressed with any aspect of Scallen's lack-of-notice argument.

■ 2. The more important issue in this case concerns the substantive role of Scallen's Canadian conviction in a Minnesota disciplinary action. Scallen undertakes to minimize the effect of his conviction by launching a broad-based comparison of American and Canadian systems of criminal justice. He argues that because certain constitutional guarantees are not expressly incorporated into Canadian criminal procedure, he was not accorded full due process by American standards. As a result, he reasons, the facts necessarily found by the Canadian jury in support of its guilty verdict are not entitled to full weight in a disciplinary proceeding in this country. We are unable to accept Scallen's position because we find that it amounts to little more than an attractively packaged invitation to relitigate the facts underlying his conviction. This practice we decline to adopt.

We hold that if the facts and circumstances surrounding a foreign conviction indicate that the lawyer involved was accorded fundamental fairness and due process, the foreign conviction will be admitted as proof of the underlying facts found by the foreign jury or tribunal. The Lawyers Professional Responsibility Board need not sacrifice valuable resources proving for a second time facts previously established in a fundamentally fair trial. In addition, we will require that facts so established constitute a felony under Minnesota law in order to base the disciplinary proceedings solely on the fact of a felony conviction. Needless to say, however, facts established by a foreign conviction may be the basis for imposition of discipline even though such facts would not support a felony conviction in Minnesota.[8] The rules set forth above will henceforth apply to the evaluation of all foreign criminal convictions irrespective of the date on which the criminal conduct occurred.

In Scallen's case, we have no difficulty concluding that his trial was fundamentally fair by American standards. American and Canadian criminal justice systems are of common ancestry, and the record of Scallen's trial is noteworthy for its similarity to rather than its divergence from a similar proceeding in this country. The prosecution's burden of proof, the rules of evidence, and the manner in which the trial itself was conducted were all identical or substantially equivalent to American counterparts. Scallen has taken pains to catalog the features which distinguish the two criminal justice systems. We have carefully examined the points he raises and find that none of them either operated to Scallen's specific prejudice or undermines the fairness of Canadian trials in general.

Having determined that Scallen's trial in Canada satisfied our requirement of fundamental fairness and due process, it must be accepted as a fact in these proceedings that he (1) knowingly published a materially false prospectus for the purpose of inducing the public to purchase Northwest securities, and (2) fraudulently (i. e., without good

7. Even were there no formal code governing attorney conduct, the public trust necessarily vested in members of the bar renders the commission of a criminal act in any jurisdiction by an attorney a grave ethical breach.

8. Likewise, a finding of not guilty in a criminal proceeding in any jurisdiction, including Minnesota, does not preclude disciplinary proceedings based on the criminal charge. This is so because the state's failure to prove a criminal defendant guilty *beyond a reasonable doubt* does not prevent the Lawyers Professional Responsibility Board from proving by *clear and convincing evidence*, a lesser evidentiary burden, that misconduct occurred.

faith claim of right) deprived Northwest of its funds for Medicor's benefit. There can be no doubt that if a Minnesota jury found these same facts, it would be justified in convicting Scallen of two felonies very similar in nature to the offenses of which he was convicted in Canada.[9] The referee so found, and we agree.

Minn.St. 609.02, subd. 2, defines a felony as "a crime for which a sentence of imprisonment for more than one year may be imposed." Under Minnesota securities regulations, it is unlawful to file a document in connection with a securities offering which is false or misleading. Minn.St. 80A.17. The willful violation of § 80A.17 subjects the offender to imprisonment of up to 5 years—a felony.

The Minnesota theft statute is found at Minn.St. 609.52. Relevant portions of the Minnesota statute rather closely parallel their Canadian counterparts:

"Subd. 2. Whoever does any of the following commits theft * * *:

"(1) Intentionally and without claim of right takes, uses, transfers, conceals or retains possession of movable property of another without his consent and with intent to deprive the owner permanently of possession of the property; or

\* \* \* \* \* \*

"(5) Intentionally commits any of the acts listed in this subdivision but with intent to exercise temporary control only and;

"(a) The control exercised manifests an indifference to the rights of the owner or the restoration of the property to him; or * * *."

Under § 609.52, subd. 3, Scallen's theft of $3 million could result in his incarceration for a period of not more than 10 years—again a felony.

■ 3. The final responsibility for appropriate discipline lies with this court. We have in the past and will in the future continue to place great weight upon the recommendations of the referee concerning disciplinary sanctions. Nevertheless, we occasionally find it necessary to modify such recommendations in the exercise of our responsibility. Initially, we note that the referee found Scallen's to be a singular act of misconduct. Also, we are impressed by the caliber and standing in the legal community of the witnesses who came forth to testify on behalf of Scallen. However, we have determined to modify the recommended discipline primarily because of the nature of the relationship between Scallen and the various corporate entities with which he was involved.

■ A lawyer who leaves private practice to enter the business world carries with him a unique responsibility. If he operates as a sole proprietor, he can act as his own counsel without prejudice to others. However, when he engages in a partnership or corporate business venture, he must meticulously differentiate his role as an attorney from that of a businessman. The dictates of the Code of Professional Responsibility follow an attorney wherever he or she may travel and govern the attorney's every activity. No one doubts that the pressures of a rather volatile business environment can operate to produce errors in judgment and a blurring of business and legal roles. And while we by no means condone Scallen's activities, we think the circumstances under which they occurred make Scallen's case an inappropriate one for imposition of the ultimate sanction of disbarment.

■ At the disciplinary hearing, Scallen accepted full responsibility for the transfer of the Northwest funds but stated that he certainly did not intentionally violate a Canadian law. He also recognized that his conduct did not meet the standards required of a lawyer, that he had acted too quickly and without taking the time to reflect on the ramifications of his actions. He stated that, upon due consideration, he recognized that there was an element of conflict of interest in the situation, and that

---

**9.** The Canadian Criminal Code does not categorize crimes as felonies or misdemeanors, but each of the offenses of which Scallen was convicted carried a large enough prison sentence to qualify it as a felony under Minnesota law.

he had acted foolishly and exercised bad judgment. He testified that he did not personally benefit from the transaction, and at the time he thought he was acting in the best interests of both corporations and their shareholders. He recognized that a lawyer who is acting as a business executive retains the obligation to adhere to the Code of Professional Responsibility, and that those standards are higher than those required of the average businessman. He now recognizes the necessity of obtaining independent legal advice when he is in doubt about the appropriate conduct in a complex situation. These admissions serve to highlight the heavy burden placed on attorney-business people and the difficulties arising therefrom.

At oral argument, respondent's counsel argued that Scallen's offenses were technical in nature and accordingly not demonstrative of "moral turpitude." This assertion was made the basis for a suggestion that censure was an adequate sanction for Scallen's misconduct. We reject this notion in strongest terms. More so than any segment of our population, attorneys—particularly those who undertake business endeavors—are to be expected to be familiar with and abide by technical regulatory measures. Thus, although we find it appropriate to modify the referee's recommendation of disbarment for the reasons stated above, we consider censure a wholly inadequate sanction.

We hold that Thomas K. Scallen shall be indefinitely suspended from the practice of law in the State of Minnesota, with the right to apply for readmission to practice 5 years subsequent to the date of this judgment.

SHERAN, C. J., and PETERSON, J., took no part in the consideration or decision of this case.