**In the Matter of the Application for the DISCIPLINE OF Gerald A. OKERMAN, an Attorney at Law of the State of Minnesota.**

No. 50809.

Supreme Court of Minnesota.

Oct. 2, 1981.

Rehearing Denied Oct. 26, 1981.

Michael J. Hoover, Director of Lawyers Professional Responsibility Board, Janet Dolan and Richard C. Baker, Staff Attys., Lawyers Professional Responsibility Board, St. Paul, for appellant.

Jack S. Nordby, Minneapolis, for respondent.

PER CURIAM.

This case is before the court following the conclusion of a consolidated hearing of three petitions for discipline of Gerald A. Okerman pursuant to an order of this court dated June 12, 1980, *In re Okerman*, 298 N.W.2d 28 (Minn.1980). The June 12 order also directed that Mr. Okerman be immediately suspended from the practice of law pending final determination of the disciplinary proceedings. The court appointed the Honorable Clarence A. Rolloff as referee to hear the petitions for discipline brought by the Lawyers Professional Responsibility Board, and a hearing was held on March 24–25, 1981. Referee Rolloff filed findings of fact, conclusions of law and a recommendation for disbarment on May 5, 1981.

The respondent, Gerald A. Okerman, was admitted to practice law in this state in 1972. He is 35 years of age, married, and the father of three children. Mr. Okerman's law practice and outside business interests have revolved around a number of real estate development enterprises. The interplay of these enterprises and his law practice has been the source of a number of incidents of professional misconduct.

On November 30, 1979, a Lawyers Professional Responsibility Board panel met to consider the first five—of what would eventually total ten—complaints brought against Mr. Okerman. Respondent has never disputed the essential facts alleged in

Complaints 1 through 5, which formed the basis for the first petition for disciplinary action. The initial complaints all involved the misappropriation or misuse of funds of others.

Mr. Okerman commingled client funds, personal funds, and the funds of his father's construction company (Okerman Construction, Inc.) in a law firm trust account, beginning at least as early as February 1978. After depositing the client funds in the trust account, Mr. Okerman would appropriate them to his own personal use without the knowledge, consent, or authorization of the clients to whom the funds belonged.

On February 28, 1978, Mr. Okerman was appointed conservator for Malachi Harney, an 83-year-old man with failing eyesight who needed someone to manage his estate and write checks for him. The conservatorship had assets of $148,283.82 at the time of his appointment. Beginning on March 23, 1978, and continuing until July, 1979, respondent made a series of fund transfers from the conservatorship to a financially troubled real estate development business (Pebblebrook Partners II) in which he owned a substantial interest. By July 1979 Mr. Okerman had converted over $100,000 of Malachi Harney's assets and had applied those assets to obligations owed by Pebblebrook Partners II. Fourteen months after the first conversion, respondent executed promissory notes on behalf of Pebblebrook Partners II to falsely characterize the conversions as loans. In addition, he executed an assignment which purported to pledge certain treasury notes as security for the withdrawals from the Harney conservatorship. However, the treasury notes had already been pledged by Mr. Okerman to secure the Pebblebrook II project's mortgage.

Beginning in March 1979, and continuing thereafter, Mr. Okerman misappropriated over $100,000 of the capital contributions that his fellow partners had made to a partnership named Burning Tree Club Partners. Respondent was able to accomplish the withdrawals because he had signatory power over the partnership checking account. As with the misappropriated Harney conservatorship money, the Burning Tree Club funds were used to pay various expenses incurred by Okerman Construction, Inc., as well as real estate taxes due on the homes of respondent, his father and brother-in-law, which were under construction at the time.

The financial difficulties which the Pebblebrook II project and Okerman Construction, Inc., had been experiencing continued throughout the entire period during which Mr. Okerman was misappropriating client and partnership funds. In order to conceal the shortages of funds in the various accounts, respondent engaged in a practice known as "check-kiting." The scheme required that the funds in three banks and seven different accounts be manipulated to prevent the detection of overdrafts.

A law clerk working for respondent's law firm (Okerman, Susee, and Lee) discovered the check-kiting in July 1979, and threatened to report Mr. Okerman to the Lawyers Professional Responsibility Board. At that point respondent admitted to Mr. Hoover of the Board that he had been check-kiting, and submitted himself for discipline.

Mr. Okerman's response to Complaints 1 through 5 is basically that he didn't intend to permanently retain the misappropriated funds, that the money was applied to his business debts as opposed to more "personal" expenses and, finally, that restitution of the funds has been made.

Following the revelation of respondent's check-kiting, he terminated his association with his law firm. However, his former partners helped arrange for Mr. Okerman to have a source of income by making him the manager of the Lakeland Plaza Shopping Center. Mr. Okerman, his former law partners, and some others owned the shopping center. This new position gave rise to the filing of a supplementary petition for disciplinary action which contained Complaint 6.

While managing the shopping center, respondent used his signatory power to misappropriate shopping center funds. After an investigation of his activities had been

begun by Mr. Hoover, Mr. Okerman made unauthorized withdrawals of approximately $35,000 in shopping center funds. This money was used to repay one of the Burning Tree Club partners who had threatened Mr. Okerman with criminal prosecution and adverse publicity.

In November 1979 respondent and Mr. Hoover stipulated to allow respondent to practice under supervision pending the outcome of these proceedings. Mr. Okerman had continuing financial problems with his business, but did not discuss them with his supervisor. Instead, while under supervision, Mr. Okerman withdrew an additional $34,000 from the shopping center funds, and concealed this withdrawal by preparing a false accounting.

A third petition for disciplinary action was filed against Mr. Okerman February 20, 1981. It contained Complaints 7 through 10. Complaints 7 and 8 accused Mr. Okerman of neglecting the legal matters of two clients. As with the previous complaints, respondent admits the basic facts of each incident.

In August 1978, respondent was retained by Corey Minnich for the purpose of resolving a home landscaping dispute. Respondent failed to attend meetings and return phone calls in connection with this matter. In August 1980 he did establish an escrow agreement to protect Mr. Minnich's interests. Shirley Nelson (now Shirley Nelson Hill) hired Mr. Okerman to probate the estate of her husband. Mr. Okerman was dilatory in winding up the affairs of the estate, and the probate court issued a citation for the failure to file a timely inventory.

Complaints 9 and 10 are rather straightforward allegations of misconduct which arise out of complex factual settings. Mr. Okerman disputes the basic facts of both of these complaints, but the referee found against him on both counts.

Mr. Okerman was sued by co-investors in the Pebblebrook II apartment complex project. The suit arose out of a sale of the apartment project prior to the beginning of construction. The construction company belonging to Mr. Okerman and his father was to build the apartment building. Numerous problems beset the construction project, including strikes, vandalism and cost overruns. These problems led Mr. Okerman to mislead the investors concerning the use of their payments to the project. Mr. Okerman used pro-rata interest and insurance payments to pay moneys owed by Okerman Construction, Inc., to subcontractors without informing the investors. The investors obtained a judgment against respondent and his father, but a settlement was arranged whereby respondent assumed the obligations owed by his father.

Regarding Complaint 10, the referee found that Mr. Okerman issued two checks on insufficient funds in August 1980. The checks were issued to the attorney of two individuals pursuant to Mr. Okerman's personal guarantee on a promissory note. The attorney, Mr. Lindstrom, testified that he was told by Mr. Okerman not to cash the checks until after 3 p. m., but that the money to cover the checks had been obtained through a loan. In fact, no loan had been made at that time and the checks were returned unpaid. Mr. Okerman takes the position that, though he wrote the checks at a time when he knew there were no funds to cover them, he asked Mr. Lindstrom not to deposit the checks until Mr. Okerman called to say he should.

Respondent began treatment for alcoholism September 1, 1979, and from that date until the present he has essentially stopped drinking. He testified that he was not drinking at the time he made the withdrawals from the Lakeland Plaza Shopping Center account. Mark T. Schaefer, Mr. Okerman's counselor, testified that, "I didn't see alcohol as the primary problem * * *. The problems Jerry had with alcohol were minimally [sic]. Were at a minimum level to at least qualify for alcoholism."

Respondent also presented several witnesses who attested to his character and community and church activities.

This court has held that misappropriation of clients' funds justifies disbarment. *See*

*In re Primus,* 283 N.W.2d 519 (Minn.1979). Misappropriation of client funds "constitutes willful misconduct involving moral turpitude, indicates that [the attorney] is unfit to practice law, and justifies disbarment." *Id.* at 520. Mr. Okerman misappropriated over $100,000 of the funds of the Harney conservatorship; commingled personal, business and client funds; and misappropriated substantial amounts of money from various business associates. In each of these incidents an active effort was made to conceal the misappropriations through "check-kiting," fraudulent promissory notes and assignments, oral misrepresentations, and false account records.

Commingling, misappropriations of client funds, and the concealment of those activities violate disciplinary rules of the Minnesota Code of Professional Responsibility. *See, e. g.,* D.R. 1–102(A)(1), (2), (3), (4), (5), (6); 9–102(A), (B).

Though two instances of client neglect are mentioned, and in one instance Mr. Okerman's delay resulted in a probate court citation, the misappropriation activity is clearly the most egregious misconduct. Regarding misappropriation matters, the New Jersey Supreme Court has commented:

> In summary: maintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that mitigating factors will rarely override the requirement of disbarment. If public confidence is destroyed, the bench and bar will be crippled institutions. Functioning properly, however, in the best traditions of each and with full public confidence, they are the very institutions most likely to develop required reform in the public interest.

*In re Wilson,* 81 N.J. 451, 461, 409 A.2d 1153, 1157–58 (1979).

Mr. Okerman argues that several factors create mitigating circumstances which call for some lesser discipline in his case. These factors include: disclosure of misconduct, alcoholism, lack of personal gain, restitution, and rehabilitation. None of these factors individually or cumulatively show significant mitigation, in the opinion of this court.

Mr. Okerman "disclosed" his misconduct upon its discovery by a law clerk who had threatened to report him to the Lawyers Professional Responsibility Board. This compelled disclosure is less illustrative of the quality of Mr. Okerman's integrity than his failure to disclose the false shopping center account he prepared after a disciplinary investigation of his activities had begun.

Mr. Okerman believes that he is an alcoholic. However, the testimony seems to indicate that his drinking is not the cause, but rather an effect, of the problems resulting from the decisions he makes while sober. He admits that his withdrawals from the Lakeland Plaza Shopping Center account were made after he had stopped drinking and had been attending Alcoholics Anonymous for several months. The type of alcoholism which this court has viewed as mitigating is "acute" alcoholism. *See In re Nurnberger,* 272 N.W.2d 914, 914 (Minn. 1978). Mr. Okerman's own expert placed him at the beginning stages of alcoholism.

Mr. Okerman argues that since the money he misappropriated was applied to his business debts as opposed to "personal luxury or extravagance," his "lack of personal gain" constitutes a mitigating factor. Not only is this distinction offensive, it is unsupported by the facts. Some of the Harney conservatorship money went to pay the real estate taxes on a $300,000 home respondent was building. Mr. Okerman admits in his brief that this home was an extravagance. In addition, he certainly contemplated obtaining personal gain from the business investments which client funds helped keep afloat. Paying the debt of a subcontractor isn't buying a boat, but title to a large apartment building is certainly an accession to wealth.

Restitution of misappropriated funds has been called an "honesty of compulsion." *In re Wilson,* 81 N.J. at 457, 409 A.2d at 1156. The fact that Mr. Okerman was able to replace the funds quickly by liquidating some of his investments makes the initial

taking all the more reprehensible. When faced with the choice of liquidating one of his own investments or using someone else's money, Mr. Okerman invariably chose the latter. The petitioner correctly points out that Mr. Okerman embezzled funds from Lake Plaza in order to make restitution to a business associate who was threatening a report to the Hennepin County Attorney. Respondent's Exhibit C lists several of the assets available to respondent during the time he was misappropriating funds, and those assets exceed $250,000.

Respondent feels that his active involvement in church and community activities, along with his candor and contrition about admitting his wrongdoing, attest to the fundamental changes he has made in his life. Though Mr. Okerman's attempt to rehabilitate himself is commendable, such conduct does not affect this court's paramount obligation to maintain the public's confidence in the integrity of the bar. *Cf. In re Hennings,* 283 N.W.2d 896 (Minn.1979) (wherein disbarment was compelled in spite of the respondent's dedication to a life of Christian ministry).

Our conclusion is to follow the referee's recommendation that the respondent be disbarred.[1] Despite Mr. Okerman's citation to a variety of cases where a lesser sanction was imposed than disbarment, in each case either the conduct was less egregious or the mitigation was stronger than the facts presented here. *See, e. g., In re Ojala,* 289 N.W.2d 108 (Minn.1979); *In re McCallum,* 289 N.W.2d 146 (Minn.1980). In view of the serious nature of his conduct, the fact that it continued after investigation and supervision had begun, and the absence of sufficiently mitigating circumstances, Mr. Okerman is hereby disbarred.

---

1. "We have in the past and will in the future continue to place great weight upon the recommendations of the referee concerning disciplinary sanctions." *In re Scallen,* 269 N.W.2d 834, 841 (Minn.1978).