**In the Matter of the Petition for DISCIPLINARY ACTION AGAINST Steven J. DAFFER, a Minnesota Lawyer.**

**No. C1–82–836.**

Supreme Court of Minnesota.

Feb. 10, 1984.

Michael J. Hoover, William J. Wernz, Lawyers Professional Responsibility Board, St. Paul, for appellant.

Joe A. Walters, Robert A. Brunig, O'Connor & Hannan, Minneapolis, for respondent.

PER CURIAM.

On May 27, 1982, Steven J. Daffer, a member of the bar of this state, was convicted in federal district court of mail fraud. The Lawyers Professional Responsibility Board subsequently filed this disciplinary action against respondent Daffer, charging him with five counts of misconduct arising from or related to the federal criminal charge. Respondent was suspended from practice on July 21, 1982, pending final disposition of the disciplinary proceedings. A referee was appointed and a hearing was held on March 24 and 25, 1983. On August 8, 1983, the referee filed findings of fact and conclusions of law, finding all five counts in the director's petition to have been proved.[1] He recommended that respondent's temporary suspension be continued until October 21, 1983, and, as conditions for restoring respondent's license to practice, he recommended that (1) respondent perform a number of hours of community service, and (2) his practice be supervised for three years. The director challenges those recommendations on appeal, and requests either disbarment or a minimum suspension of five years. We hold that respondent shall be indefinitely suspended from the practice of law in this state, with right to apply for readmission to practice five years from the date of his temporary suspension.

Respondent is 32 years old. He was admitted to practice law in this state on October 22, 1977. From that time through October 31, 1981, he was associated with a Minneapolis law firm. After leaving that firm, he worked as a sole practitioner until his suspension on July 21, 1982.

Sometime before August of 1981, respondent opened two investment accounts with Dain Bosworth, Inc. ("Dain Bosworth"), a brokerage firm. On August 12, 1981, Dain Bosworth mistakenly deposited $150,000 of another person's funds into respondent's "Liquid Capital Income" account. Prior to that deposit, respondent had a balance of $109.10 in that account. Then, on September 21, 1982, Dain Bosworth mistakenly deposited another $19,605.49 into that same account.

About that time, respondent and a friend began plotting a scheme to earn money by using the funds which had been erroneously deposited in respondent's account. On September 23, 1981, respondent transferred $172,534.48 from his "Liquid Capital Income" account into his other Dain Bosworth account. He subsequently contacted Investment Rarities, Inc. ("Investment Rarities") on October 5, 1981, and obtained information about purchasing precious metals. The next day respondent's friend inquired about hotels in the New York City area and then furnished respondent with the name of a hotel in that city to use as a delivery spot for a shipment of gold. On October 7, 1981, respondent contacted Dain Bosworth and requested that it wire transfer $152,935.10 to an account of Investment Rarities. With those funds, he purchased 200 Canadian one-ounce gold Maple Leafs and 126 South African one-ounce gold Krugerrands. He instructed Investment Rarities to deliver the gold to a Michael Cohen in New York. According to their plan, the friend was to assume the fictitious name and identity of Michael Cohen.

In furtherance of their scheme, respondent wrote detailed instructions for his friend's use in concealing the receipt of the gold. On October 11, 1981, the friend trav-

---

1. Because neither party ordered a transcript, the referee's findings of fact and conclusions of law are conclusive pursuant to Minn.R.Law.Prof. Resp. 14(d).

eled to New York City to accept delivery of the gold. Meanwhile, respondent prepared identification cards in the name of Michael Cohen, by altering several identification cards belonging either to himself or another, and sent those identification cards to his friend on October 12, 1981. While posing as Michael Cohen, the friend accepted delivery of the gold shipment on October 14, 1981, and then returned to Minneapolis that same day.

On October 15, 1981, a Dain Bosworth employee phoned respondent to report irregularities in his account. He met with representatives of Dain Bosworth the next day and admitted that he had withdrawn from his account funds that did not belong to him. Either that day or shortly thereafter, respondent requested that Dain Bosworth refrain from informing the authorities. Respondent claimed that his friend would not agree to return the money unless Dain Bosworth agreed to do so. Dain Bosworth, however, refused to enter into any such agreement. So, to ensure a return of the funds, respondent forged Dain Bosworth's signature on a document purporting to represent that Dain Bosworth would not inform legal authorities of their actions.

On October 21, 1981, respondent returned to Dain Bosworth the funds which he had withdrawn, together with appropriate interest. The next day, before any approach or inquiry was made of him, he called the offices of the United States Postal Inspector and the United States District Attorney and requested a meeting to discuss his conduct. Also on that day, he paid to Investment Rarities the Minnesota sales and use tax in connection with the gold purchase. On February 19, 1982, respondent was charged in the United States District Court for the District of Minnesota with having committed the federal felony of mail fraud. He subsequently pled guilty to that charge and was convicted on May 27, 1982.

The Professional Responsibility Board then filed this disciplinary action and the matter was referred to a referee. After a hearing, the referee concluded that respondent's participation in the mail fraud violated Minn.Code Prof.Resp. DR 1–102(A)(3) and (4); his attempt to unlawfully avoid payment of Minnesota sales and use tax by accepting shipment of the gold in New York violated Minn.Code Prof.Resp. DR 1–102(A)(4); his alteration of identification cards violated Minn.Code Prof.Resp. DR 1–102(A)(4); his attempt to dissuade Dain Bosworth from reporting his actions to the authorities violated Minn.Code Prof.Resp. DR 1–102(A)(5); and his forgery of Dain Bosworth's signature violated Minn.Code Prof.Resp. DR 1–102(A)(4).[2] The referee recommended that respondent's temporary suspension be continued until October 21, 1983 (a total period of 15 months). He also recommended imposing certain conditions on restoring respondent's license to practice at that time.

There is no question in this case that respondent's misconduct warrants severe disciplinary action. The only question presented concerns just what sanction is appropriate under the circumstances. On appeal, the director challenges the referee's recommendations, urging that respondent's several acts of misconduct warrant more severe discipline. Stressing respondent's felony conviction, he contends that Daffer should either be disbarred or at least suspended for a minimum of five years.

This court has previously recognized that felony convictions do not mandate automatic disbarment. *In re Olkon*, 324 N.W.2d 192, 195 (Minn.1982); *In re Scallen*, 269 N.W.2d 834, 840 (Minn.1978). Rather, whether disbarment is required turns on a consideration of the unique circumstances of each case. *Olkon*, 324 N.W.2d at 195; *In re Kimmel*, 322 N.W.2d 224, 225 (Minn.

---

**2.** Minn.Code Prof.Resp. DR 1–102(A) provides in relevant part: "A lawyer shall not: * * * (3) Engage in illegal conduct involving moral turpitude. (4) Engage in conduct involving dishon-

esty, fraud, deceit, or misrepresentation. (5) Engage in conduct that is prejudicial to the administration of justice * * *."

1982). Each case must be analyzed in light of the purposes of an attorney disciplinary proceeding—"to protect the public and the court and to serve as a deterrent against future misconduct." *In re Weyhrich,* 339 N.W.2d 274, 279 (Minn.1983); *see also Olkon,* 324 N.W.2d at 196. Generally speaking, this court has ordered a lesser sanction than disbarment where there exist substantial mitigating circumstances. *See Olkon,* 324 N.W.2d at 196; *Scallen,* 269 N.W.2d at 841–42; *see also In re Shaw,* 298 N.W.2d 133, 135 (Minn.1980) (case involving misappropriation of client's funds—conduct which often results in disbarment).

In recommending a sanction less than disbarment, the referee found the following factors to be present: (1) "[a]cknowledgment of guilt and contrition," (2) "[f]ull and prompt restitution, including interest," (3) "[a]ll of the improper acts arose from a single transaction and occurred within a very brief time," and (4) "[r]espondent is of good character and has cooperated fully with all interested persons." [3] The director, however, stresses that respondent's misconduct involved forgery, tax avoidance, and attempts to thwart the reporting of his misconduct in addition to the felony conviction. According to the director, those aggravating factors outweigh the mitigating factors present here because those actions show such corruption of character that the public cannot be protected. Thus, the director foremost contends that disbarment is the appropriate sanction.

While it is true that respondent engaged in several acts of serious misconduct, the referee found that those acts occurred within a short span of time and they all arose out of the same transaction. Significantly, he found that "[e]xcept for the matters involved in this case, there was no testimony or indication of bad character, prior misconduct or incompetency as an attorney." For that reason, the referee considered respondent's acts as a whole arising out of a single transaction. We agree with that reasoning in the circumstances presented and, as the referee pointed out, we have tended to impose sanctions less than disbarment where the criminal activity or other misconduct involved a single event and there existed other mitigating factors such as those present here. *See Olkon,* 324 N.W.2d at 196; *Shaw,* 298 N.W.2d at 135; *Scallen,* 269 N.W.2d at 841; *cf. In re Hedlund,* 293 N.W.2d 63, 67 (Minn.1980) (attorney disbarred where there existed, among other things, repeated practice of fraudulently extracting assets from business venture and diverting them to personal use).

The primary purpose of a disciplinary action is "to guard the administration of justice and to protect the courts, the legal profession, and the public." *In re Hanson,* 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960). Thus, the key question presented here is whether a sanction less than disbarment will adequately protect those interests in the circumstances of this case. After observing respondent and weighing the evidence, the referee found him to be remorseful. He was also impressed by respondent's full admission of guilt and voluntary cooperation with both the federal authorities and the Professional Responsibility Board in this matter. The referee concluded:

3. The referee also considered it significant that (1) respondent's acts of misconduct were not connected with the practice of law, and (2) he took advantage of a fortuitous situation, but did not act to create it. Neither of those factors merits consideration as a mitigating circumstance here. While criminal conduct associated with the practice of law may cause greater concern, the type of felonious conduct here involved (misappropriation of funds) certainly draws into question the qualifications of an attorney. Misappropriation of clients' funds has generally been dealt with severely. *See In re Austin,* 333 N.W.2d 633, 634 (Minn.1983); *In re Moberly,* 319 N.W.2d 720, 720 (Minn.1982). There is no good reason to treat that type of misconduct any less severely merely because the misappropriated funds did not belong to a client. In sum, misappropriation of funds adversely reflects on an attorney's fitness to practice law. As to the second consideration, although it was fortuitous that Dain Bosworth mistakenly placed funds in respondent's account, respondent joined with another to deliberately plot and carry out a criminal scheme to misappropriate those funds.

There is no indication that Respondent would ever again violate the law or the Canons. Obviously, no one can be certain of this, but all of the evidence as to his entire life would indicate that this was an isolated incident that has made a tremendous impression upon Respondent. This impression alone is probably sufficient to insure the absence of any wrongdoing on his part in the future. It further appeared that the wrongdoing and misconduct connected with it were essentially out of character for the Respondent.

Because the referee had the opportunity to observe respondent and evaluate the evidence, we accept his evaluation of respondent's character. Although respondent's conduct cannot be condoned, it appears that he will not likely engage in unethical or illegal conduct in the future. Thus, we agree with the referee that respondent is not wholly unfit to practice law and that disbarment is not necessary here.

Alternatively, the director argues that respondent should be suspended for a longer period of time because the recommended suspension is inconsistent with the sanctions imposed in prior cases involving somewhat similar conduct. He primarily compares this case to that of *Scallen*, 269 N.W.2d 834. Scallen participated in the publishing of a prospectus in Canada and then did not use the offering proceeds as represented in that prospectus. Rather, he diverted $3 million of the proceeds to another company in which he had an interest, to pay off a loan. He was subsequently convicted in Canada of theft and of issuing a false prospectus. Disciplinary proceedings were then brought against him, and this court suspended Scallen indefinitely from the practice of law, with leave to apply for readmission in five years. *Id.* at 842. To fairly and consistently apply sanctions, the director contends that we must suspend respondent for a minimum of five years due to (1) respondent's more numerous acts of misconduct and (2) the similarity of the mitigating circumstances in each case.

Although this court ultimately decides upon the appropriate disciplinary sanction, we have often placed great weight on the recommendations of the referee and wish to emphasize that we will continue to do so in the future. *See Olkon*, 324 N.W.2d at 196; *In re Fling*, 316 N.W.2d 556, 559 (Minn.1982). Nevertheless, after reviewing the circumstances of this case and according due deference to the referee's findings, we agree with the director that respondent's misconduct warrants a more severe discipline than that recommended by the referee. Blinded by greed, respondent engaged in a complex criminal scheme involving the misappropriation of a large amount of money for no reason other than a desire to reap personal gain. We do not believe that the recommended discipline will adequately serve to deter misconduct of this type by members of the bar in general and by respondent specifically. While no two cases present identical circumstances, we agree with the director that *Scallen* provides guidance as to the appropriate discipline for this case. Respondent's numerous acts of serious misconduct taken as a whole are at least as egregious as Scallen's misconduct. Significantly, all the mitigating factors present here were essentially present in *Scallen*. *See* 269 N.W.2d at 841. Accordingly, we order that respondent shall be indefinitely suspended from the practice of law, with the right to apply for readmission to practice on July 21, 1987.