Brian F. KIDWELL, Appellant,

v.

SYBARITIC, INC., Respondent.

Nos. A07–584, A07–788.

Supreme Court of Minnesota.

June 24, 2010.

James H. Kaster, Jessica J. Clay, Sofia B. Andersson, Nichols Kaster, P.L.L.P., Minneapolis, MN, for appellant.

Katherine A. McBride, James R. Roegge, Bradley J. Lindeman, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent.

Daniel E. Warner, Warner Law Office, P.A., Inver Grove Heights, MN; and Leslie Lienemann, Culberth & Lienemann, LLP, St. Paul, MN, for amicus curiae National Employment Lawyers Association, Minnesota Chapter.

## OPINION

GILDEA, Justice.

Appellant Brian Kidwell appeals from a Minnesota Court of Appeals' decision overturning a jury verdict in his favor and granting respondent Sybaritic, Inc., judgment as a matter of law. After Kidwell was terminated from his position as in-house general counsel for Sybaritic, he commenced an action, alleging a violation of the whistleblower statute, Minn.Stat. § 181.932 (2008). Sybaritic counterclaimed, alleging breach of fiduciary duty and conversion. A jury found in favor of Kidwell and awarded him damages in the amount of $197,000, plus fees and costs. The district court denied Sybaritic's motion for judgment as a matter of law or for a new trial, and Sybaritic appealed to the court of appeals. The court of appeals reversed, holding that Kidwell did not engage in conduct protected by the whistleblower statute because he was fulfilling the responsibilities of his position of employment when he reported a suspected violation of the law. *Kidwell v. Sybaritic, Inc.*, 749 N.W.2d 855, 866–67 (Minn.App.2008). Because we conclude that Kidwell did not offer evidence from which a reasonable jury could conclude that he engaged in protected conduct, we affirm.

Sybaritic is a company that manufactures and sells equipment and spa products to spa and medical-spa industries. Kidwell was hired as in-house general counsel for Sybaritic in July 2004. Kidwell's position involved a variety of duties, including supervising company litigation, providing contract assistance, and advising on employment law issues. Kidwell explained at trial that as general counsel, he was "responsible for providing advice on any legal affairs of the company." Kidwell's employment agreement describes the broad scope of his job: "To assist the President in assuming responsibility and decisions as to all corporate legal matters, and the general legal administration of activities at Sybaritic."

On Sunday, April 24, 2005, shortly after returning from a business trip to Estonia, Kidwell sent an email to Sybaritic's management team entitled "A Difficult Duty." Kidwell began the email by stating: "I write to you all with deep regret, but I cannot fail to write this email without also

failing to do my duty to the company and to my profession as an attorney. That I will not do." In the email, Kidwell expressed concern about a "pervasive culture of dishonesty" at Sybaritic and then proceeded to set forth specific matters that concerned him. Kidwell mentioned several ongoing concerns he had, including that the company had failed to investigate dishonest salespeople, allowed someone on the staff to engage in the unauthorized practice of medicine, and failed to pay taxes owed in California. Kidwell then stated that while those acts of dishonesty were outside his area of responsibility, he had become aware of activity which he had a responsibility to report.[1]

Kidwell's "Difficult Duty" email was primarily concerned with emails Kidwell had come across earlier in 2005. Kidwell characterized these emails as "smoking guns" because he believed the emails weakened or destroyed intellectual property claims Sybaritic had pending against NeoQi, an Estonian company. Kidwell suspected that Sybaritic was obstructing discovery of the potentially damaging emails relevant to the ongoing litigation. In his "Difficult Duty" email, Kidwell said that after discovering the damaging emails, he had raised his concerns with Steve Daffer, Sybaritic's president. Daffer is also a lawyer and, according to Kidwell, Daffer implausibly claimed the emails were not discoverable. Kidwell reported that Daffer later stated that NeoQi "may have a hard time getting their hands on the damaging emails."

Shortly after Kidwell discovered the potentially damaging emails, he was scheduled to leave for Estonia to take deposi-

tions in the NeoQi case. Before Kidwell left for Estonia, the information technology manager was asked to copy the potentially damaging emails to a disk and to provide copies of the disk to Daffer, Kidwell, and Sybaritic's outside counsel, T.A. While Kidwell was in Estonia, T.A. informed Kidwell that Sybaritic had contacted T.A. expressing concern that the disk containing the emails had a virus. While T.A. was confident his antivirus software would prevent any problems, Sybaritic insisted on retrieving the disk.

Kidwell's "Difficult Duty" email, written shortly after he returned from Estonia, said that Sybaritic had retrieved the disk from T.A. and had not replaced it. According to Kidwell's email, he and T.A. both believed the disk did not contain a virus. Kidwell said he became even more suspicious when his email password suddenly changed while he was in Estonia and when, upon returning home from Estonia, he found his office door locked despite the fact he had never been provided a key to the office.

In his "Difficult Duty" email, Kidwell explained the possible legal implications of Sybaritic's actions, expressing his opinion that there were false allegations in the pleadings Sybaritic filed in the NeoQi litigation and that Sybaritic had failed to comply with discovery orders. Kidwell also expressed his belief that Sybaritic may face Rule 11 sanctions, or charges for obstruction of a court order or obstruction of justice. Kidwell concluded his "Difficult Duty" email by writing:

> It is my firm conviction that Sybaritic intends to continue to engage in tax evasion, the unauthorized practice of

---

1. The court of appeals concluded that these reports were not protected by the whistleblower statute because Kidwell had previously reported the allegations to Sybaritic. *Kidwell,* 749 N.W.2d at 868–69. Kidwell does not challenge that determination here. Accordingly, Sybaritic's motion to strike references to those portions of the email in Kidwell's brief is denied.

medicine and obstruction of justice. Accordingly, it is my intention to advise the appropriate authorities of these facts. I do this with no ill-will. To the contrary, I wish that I was not obliged to do so. However, the demand of Sybaritic that I become attorney of record in the [intellectual property action] has made it impossible to ignore the obstruction of justice issue, and compels me to speak out about the tax evasion and unauthorized practice of medicine issues which the company has refused to address. I regret that I see no other course of action available.

At trial, Kidwell testified that he sent the email to Sybaritic management "[b]ecause I hoped that we could pull this company back into compliance by enlisting some of the other members of management, and as the person responsible for the legal affairs of the company, that's what I had to do."

Kidwell also sent a copy of the email to his father, a retired businessman. Kidwell said that he sent his father a copy of the email because he "had confided in my father the ethical dilemma that I was confronted with and wanted him to know what I had elected to do and be aware of that information should I need to talk to him in the future about any action the company might take."

Kidwell researched whistleblower law before he sent the email to Sybaritic management. He testified that he did this research before sending the email because he "wanted to know if I confronted the company about these matters, what legal protections I might have."

On Monday, April 25, 2005—the morning after Kidwell sent the "Difficult Duty" email—Sybaritic responded. Sybaritic decided to change Kidwell's supervisor from Steve Daffer to Steve Chelsey, another member of Sybaritic's management team. Kidwell met with members of the Sybaritic management team that morning, and by the end of the day, a framework had been developed to work toward resolution of the issues Kidwell raised. Three weeks later, Sybaritic terminated Kidwell's employment.

Following his termination, Kidwell commenced an action against Sybaritic in Hennepin County District Court, claiming that he had been fired in violation of the whistleblower statute. Sybaritic responded with counterclaims for breach of fiduciary duty and conversion. At trial, Daffer explained that T.A.'s computer disk had been retrieved because of concerns over a computer virus. Sybaritic's information technology manager testified that when Daffer tried to access the disk containing the emails, Daffer had found hundreds of duplicate emails, and Daffer had expressed concern that any virus that may be causing that problem would also infect T.A.'s computer. The information technology manager explained that Sybaritic had requested that the disk be returned so that he could clean the disk of viruses, eliminate the duplicate emails, and create a new clean disk.

Sybaritic also presented evidence at trial that, on April 19, 2005, T.A. expressed concern to Kidwell over possible evidence tampering and indicated his plans to write a letter to Daffer, but that Kidwell asked that the letter be routed to him instead. Sybaritic's information technology manager testified that he had not prevented Kidwell from accessing the potentially damaging emails because they were downloaded on the laptop Kidwell took with him to Estonia. The manager also explained that the changed password was a standard company-wide security measure. Sybaritic also presented testimony that Kidwell's office door had been locked only because he was out of town for a lengthy period of

time and that security personnel would have opened the door had Kidwell asked.

According to Chelsey, Sybaritic decided to terminate Kidwell after Sybaritic experienced a series of problems with Kidwell over the three-week period following receipt of the "Difficult Duty" email. Chelsey explained that Kidwell reported finishing work which he had not actually finished, failed to fulfill a job duty to pay invoices to a Texas law firm, and then asked to take vacation time the week of May 9, 2005, but failed to complete a requested job task before leaving for vacation. Chelsey explained that the issue of unpaid invoices to the Texas law firm arose again while Kidwell was on vacation. Chelsey testified that he looked through Kidwell's emails to determine whether the invoices had been paid, and that was when he discovered that Kidwell had sent a copy of the "Difficult Duty" email to his father. Chelsey believed Sybaritic could no longer trust Kidwell as general counsel and testified that, as a result, management decided to terminate his employment.

Kidwell argued that Sybaritic's proffered reasons for terminating him were pretextual. Kidwell presented evidence that Sybaritic's expressed reasons for terminating him changed over time. Kidwell testified that on the day of his termination Sybaritic claimed to be firing him because both Kidwell and Daffer were unhappy with the situation. But in an interrogatory response Sybaritic claimed that its decision to fire Kidwell was performance based. Finally, Kidwell claimed that it was not until trial that Sybaritic raised the issue of Kidwell's breach of his fiduciary duty as a reason for termination.

The jury was charged with deciding Kidwell's whistleblower claim and Sybaritic's counterclaims for breach of fiduciary duty and conversion. Sybaritic and Kidwell disagreed as to the appropriate jury instructions for the whistleblower claim. Sybaritic requested the district court give the following instruction:

> An employee does not engage in a protected activity if it was the employee's job to bring to the employer's attention or the attention of any governmental agency any activities that the employee in good-faith believed were in violation of any federal, state, or local law.

The district court disagreed with Sybaritic and refused to give the requested instruction to the jury. In relevant part, the court's instructions to the jury read as follows:

> The Minnesota Whistleblower Act ["Act"] prohibits an employer from discharging an employee because the employee in good faith reports a violation or suspected violation of any federal or state law to an employer or to any governmental body or . . . law enforcement official. To recover under the Act, Brian Kidwell must prove by a greater weight of the evidence that: he engaged in protected activity, he suffered an adverse employment action because he engaged in a protected activity, and there was a casual connection between the protected activity and the adverse employment action.
>
> "Protected activity" is an employee's conduct in making a good faith report of an actual or suspected violation of a state or federal law to an employer or to any governmental body or law enforcement official.
>
> An employee engages in a protected activity under the Act if the purpose of the employee's report to the employer or an outside governmental agency was to "blow the whistle" for the purpose of exposing an illegality, that is, a violation of federal, state, or local law.

. . .

An employee does not engage in protected activity unless he made a report in good faith. To determine whether a report was made in good faith, you must look not only at the content of the report, but also at Mr. Kidwell's job and purpose in making the report at the time the report was made, not after subsequent events have transpired.

The district court also informed the jury that the court had decided, as a matter of law, that Kidwell had breached his fiduciary duty. The court instructed the jury that:

You must determine the amount, if any, of damages to award Sybaritic. In deciding the amount of damages, you have to decide the amount of money that will fairly and adequately compensate Sybaritic for the harm it suffered as a result of Mr. Kidwell's breach. . . . One measure of damages when an attorney breaches his fiduciary duty to his client is the attorney may forfeit his right to compensation.

On the whistleblower claim, the jury found that (1) Kidwell had engaged in protected activity, (2) the suspected illegal conduct had been reported in good faith, and (3) the protected activity was a substantial motivating factor in Sybaritic's decision to terminate Kidwell's employment. The jury awarded Kidwell compensation for back wages, past emotional distress, and future wages. The jury also found that Kidwell would not have been fired at the time he was unless he had engaged in the protected activity. In regard to Sybaritic's counterclaims, the jury found Sybaritic had suffered no damages as a result of Kidwell's breach of fiduciary duty. The

jury also found Kidwell had converted Sybaritic's property and determined the fair market value of those losses to be $2,000.

After the jury verdict, Sybaritic made a motion for judgment as a matter of law, disgorgement of any award in favor of Kidwell, or alternatively a new trial. Among other arguments, Sybaritic asserted that the district court erred in refusing to instruct the jury that in order to constitute protected activity under the whistleblower statute, the employee must not be fulfilling responsibilities for which he was employed. The district court denied Sybaritic's motion and entered judgment for Kidwell in the amount of $197,000, plus fees and costs.

Sybaritic appealed to the court of appeals. The court of appeals reversed, holding that (a) an in-house attorney is not per se barred from bringing a claim under the whistleblower statute, Minn.Stat. § 181.932, and (b) an employee does not engage in protected activity under the whistleblower statute when that employee's report to his employer is in fulfillment of the employee's job duties. *Kidwell v. Sybaritic, Inc.*, 749 N.W.2d 855, 856–57 (Minn.App.2008). The court of appeals determined that Kidwell's "Difficult Duty" email concerned matters within the scope of his job duties and therefore was not a protected report under the whistleblower statute. *Id.* at 866–67. As a result, the court of appeals concluded that Sybaritic is entitled to judgment as a matter of law. *Id.* at 867.[2]

Kidwell filed a petition for further review, asking us to decide whether an employee engages in conduct protected by the whistleblower statute when the em-

---

**2.** Because of this disposition, the court of appeals did not resolve Sybaritic's argument that the district court improperly instructed the jury or the issue of whether Kidwell was required to disgorge some of the damages awarded to him due to his breach of fiduciary duty. *Kidwell,* 749 N.W.2d at 869–70.

ployee reports a violation or suspected violation of the law while also fulfilling the employee's job duties. Sybaritic filed a request for conditional cross-review, raising the issues of (1) whether an in-house attorney is precluded from or limited in claiming protection under the whistleblower statute, (2) whether an attorney who breaches a fiduciary duty is entitled to any unearned compensation following that breach, and (3) whether the good faith jury instruction given by the district court was erroneous. We granted review on all four issues.

## I.

The first question we consider involves the scope of statutorily-protected conduct under the whistleblower statute, Minn. Stat. § 181.932. Sybaritic argues that Kidwell cannot recover under the whistleblower statute as a matter of law because Kidwell served as in-house general counsel for Sybaritic and the statute does not protect employees who make reports of illegal or suspected illegal conduct as part of their job duties. In other words, Sybaritic argues that the whistleblower statute contains a so-called "job duties exception." The court of appeals agreed with Sybaritic, holding that a report made in fulfillment of an employee's job duties does not constitute statutorily-protected conduct. *Kidwell*, 749 N.W.2d at 866–67. Kidwell argues, however, that the language of the whistleblower statute does not contain a job duties exception, and as a matter of public policy, a job duties exception would virtually eliminate the protections of the whistleblower statute.

### A.

■ The parties' arguments require that we examine the effect, if any, an employee's job duties have in determining whether an employee engaged in statutorily-protected conduct under the whistleblower statute. Statutory interpretation presents a question of law that we review de novo. *Hans Hagen Homes v. City of Minnetrista*, 728 N.W.2d 536, 539 (Minn. 2007). When we interpret a statute, our goal must be to "effectuate the intent of the legislature," and we construe the statute's words and phrases according to their "plain and ordinary meaning." *State v. Koenig*, 666 N.W.2d 366, 372 (Minn.2003); *see also* Minn.Stat. § 645.16 (2008).

We begin our analysis with the language of the statute. The whistleblower statute provides that an employer shall not "discharge, discipline, threaten, otherwise discriminate against, or penalize an employee," because the employee, "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn.Stat. § 181.932, subd. 1. The statute defines "employee" as "a person who performs services for hire in Minnesota for an employer." Minn.Stat. § 181.931, subd. 2 (2008).[3] The statute requires only that the employee report in good faith a violation or suspected violation of the law, and the statute contemplates that the report can be made to "an employer." Minn.Stat. § 181.932, subd. 1(1).

■ The whistleblower statute does not contain any limiting language that supports the blanket job duties exception the court of appeals crafted. We therefore reject as too broad the court of appeals' conclusion that, as a matter of law, "an employee does not engage in protected

---

**3.** The definition of "employee" excludes independent contractors. Minn.Stat. § 181.931, subd. 2.

conduct under the whistleblower act if the employee makes a report in fulfillment of the duties of his or her job." *Kidwell,* 749 N.W.2d at 866.[4]

Although we hold that the whistleblower statute does not contain a job duties exception, we do not go so far as to hold that an employee's job duties are irrelevant in determining whether an employee has engaged in protected conduct. We have explained that the whistleblower statute "protects the conduct of a neutral party 'who "blows the whistle" for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower.'" *Obst v. Microtron, Inc.,* 614 N.W.2d 196, 200 (Minn.2000) (quoting *Williams v. St. Paul Ramsey Med. Ctr., Inc.,* 551 N.W.2d 483, 484 n. 1 (Minn. 1996)). The legislature's purpose in confining protection to "a neutral party" is reflected in the requirement that the report must be made in "good faith." *See* Minn.Stat. § 181.932, subd. 1(1).

While the legislature did not define "good faith" in the whistleblower statute, we have said that for a report to satisfy the "good faith" requirement, "the report that is claimed to constitute whistle-blowing" must be "made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim." *Obst,* 614 N.W.2d at 202. In determining good faith, we consider not only the content of the report, but also the employee's purpose in making the report. *Id.* The "central question" is whether the report was made "for the purpose of blowing the whistle, i.e. to expose an illegality." *Id.* An examination of the employee's job duties could be helpful in answering this central question.

The Federal Circuit Court of Appeals, interpreting the federal Whistleblower Protection Act (WPA),[5] has provided useful examples illustrating the relevance of the reporting employee's job duties. *See Huffman v. Office of Personnel Mgmt.,* 263 F.3d 1341, 1352 (Fed.Cir.2001). We have previously relied on federal cases construing the WPA when interpreting our whistleblower statute. *See Anderson–Johanningmeier v. Mid–Minn. Women's Ctr., Inc.,* 637 N.W.2d 270, 277 (Minn.2002) (citing federal cases interpreting WPA). We relied on the federal cases in *Anderson–Johanningmeier* when discussing the requirement of "good faith" in our statute. *Id.* Similarly, in this case, our discussion of *Huffman* arises in the context of construing the element of "good faith" in our statute. As the court in *Huffman* recognized, "'the WPA is intended to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel.'" 263 F.3d 1341, 1353 (quoting *Willis v. Dep't of Agric.,* 141 F.3d 1139, 1144 (Fed. Cir.1998)). This purpose is evidenced through Congress' requirement that pro-

---

**4.** In reaching this conclusion, the court of appeals applied its previous decisions, as well as decisions from federal courts applying Minnesota law holding that "[t]he whistleblower statute does not grant protection to an employee whose job duties require him or her to ensure legal compliance." *Skare v. Extendicare Health Servs., Inc.,* 515 F.3d 836, 841 (8th Cir.2008); *see also Freeman v. Ace Tel. Ass'n,* 404 F.Supp.2d 1127, 1139 (D.Minn. 2005), *aff'd,* 467 F.3d 695 (8th Cir.2006); *Grundtner v. Univ. of Minn.,* 730 N.W.2d 323, 330 (Minn.App.2007); *Gee v. Minn. State*

*Colls. and Univs.,* 700 N.W.2d 548, 555–56 (Minn.App.2005); *Michaelson v. Minn. Mining & Mfg. Co.,* 474 N.W.2d 174, 180 (Minn. App.1991), *aff'd mem.,* 479 N.W.2d 58 (Minn. 1992).

**5.** *See* Whistleblower Protection Act of 1989, Pub. L. No. 101–12, 103 Stat. 16 (codified at various sections of 5 U.S.C.) (providing statutory protections for federal employees who engage in whistleblowing).

tected reports are those where the employee discloses conduct that the employee "reasonably believes evidences" a violation of law. 5 U.S.C. § 2302(b)(8)(A) (2006). As we noted in *Obst,* the purpose behind our statute, as evidenced by the requirement of "good faith," is to protect disclosures made by neutral parties who report violations of the law for the public good. 614 N.W.2d at 200. We conclude, as we did in *Anderson–Johanningmeier,* that the similarity in purpose behind the WPA and the Minnesota whistleblower statute of protecting reports made with the public good in mind makes the analysis of *Huffman* helpful.[6] *Anderson–Johanningmeier,* 637 N.W.2d at 277.

In *Huffman,* the court recognized that an employee who "has, as part of his normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and, in fact, reports that wrongdoing through normal channels" is not engaging in protected conduct under the WPA. 263 F.3d at 1352. The same is true under our whistleblower statute. An employee cannot be said to have "blown the whistle" when the employee's report is made because it is the employee's job to investigate and report wrongdoing.[7] When an employee responsible for investigating and reporting illegal

behavior makes a report of such behavior, that employee will need something more than the report itself to support the conclusion that the employee is making the report as a "neutral party" who is intending to "blow the whistle." *See Obst,* 614 N.W.2d at 200. This is true because when it is the employee's job to report illegality, there is no basis to infer from the mere fact of a report that the employee's report was made to "blow the whistle."

But, as discussed in *Huffman,* even an employee whose job duties include investigating and reporting wrongdoing could show that a report to her employer is protected conduct depending upon to whom the report is made. 263 F.3d at 1354. Where an employee with responsibility for investigating and reporting wrongdoing submits a report documenting wrongdoing outside normal channels, because the employee believes that the normal chain of command is unresponsive, that employee could be viewed as engaging in protected conduct. *Id.* We agree that in such a situation under our whistleblower statute, because the report was made outside the employee's chain of command, a reasonable fact-finder could, depending on the evidence, infer that the employee's

**6.** The dissent questions our reliance on *Huffman* and notes that at least one jurisdiction has rejected the analysis in *Huffman. See Rogers v. City of Fort Worth,* 89 S.W.3d 265, 276 (Tex.App.2002). But, as the dissent notes, the relevance an employee's job duties will have on the question of whether the report is protected depends on the statutory scheme in which the whistleblower provision is found. It was precisely because of unique provisions in the Texas statute that the *Rogers* court did not follow the *Huffman* analysis. The statute at issue in *Rogers* did not protect reports made to employers. The statute protects reports made "to an appropriate law enforcement agency." *Rogers,* 89 S.W.3d at 274 (citing Tex. Gov't Code Ann. § 554.002(a)). The Texas statute therefore

does not present the situation at issue in this case, and addressed in *Huffman,* where an employee with responsibility for ensuring that his employer complies with the law makes a report to his employer about violations of the law, and contends that that report is protected conduct.

**7.** We do not look to *Huffman* in order to engraft onto our whistleblower statute "an artificial evidentiary hurdle," as the dissent argues. Our discussion of the examples from *Huffman* is intended to provide a non-exhaustive illustration of ways in which an employee's job duties could inform the question of "good faith" under the whistleblower statute.

purpose was to expose an illegality.[8]

Finally, the *Huffman* court noted that if an employee is obligated to make a report of wrongdoing, but the report is made outside the scope of the employee's normal or assigned job duties, the report could still be protected conduct under the WPA. *Id.* As an example of that situation, the court cited the federal regulation that requires all government employees to report "waste, fraud, abuse, and corruption to appropriate authorities." *Id.* at 1354 n. 6 (citing 5 C.F.R. § 2635.101(b)(11)). Employees subject to this regulation could be disciplined if they failed to report the wrongdoing. These employees therefore could be said to be fulfilling job requirements when reporting misconduct. But these reports could be viewed as protected conduct because they are not the employee's normal or assigned work responsibilities. *Id.* at 1354. We agree that under our whistleblower statute, a reasonable fact-finder could, depending on the evidence, infer that an employee who makes a report based on an employment-related obligation, but not as part of an assigned job duty, was doing so in order to expose an illegality.

### B.

With the general principles discussed above in mind, we consider whether, as Sybaritic argues, the district court erred when it denied Sybaritic's motion for judgment as a matter of law. We review the court's decision de novo and apply the same standard the district court uses. *Bahr v. Boise Cascade Corp.,* 766 N.W.2d 910, 919 (Minn.2009). Under that standard, we construe the evidence in the light most favorable to the prevailing party, which in this case is Kidwell. *Id.* We ask whether, when the evidence is so construed, "there is [a] legally sufficient evidentiary basis for a reasonable jury to find" that Kidwell engaged in protected conduct. Minn. R. Civ. P. 50.01(a). That we construe the evidence in the light most favorable to the verdict however does not mean that we are precluded from actually examining the evidence to assess whether there is a sufficient basis for the jury's finding. *See Reedon of Faribault, Inc. v. Fidelity and Guar. Ins. Underwriters, Inc.,* 418 N.W.2d 488, 491 (Minn.1988) (reversing jury verdict and noting that implicit in the "well established rules circumscribing an appellate court's review of jury findings ... is the premise that there must exist some evidence to support the verdict"); *Rettman v. City of Litchfield,* 354 N.W.2d 426, 429 (Minn.1984) (reversing jury verdict because evidence was "practically conclusive against the jury finding" on question of fact). Upon examination of the record, we conclude that the evidence is "practically conclusive against the jury finding" that Kidwell engaged in protected conduct. *See id.*

As discussed above, an employee's job duties may inform the question of the em-

---

**8.** By providing this example we do not conclude as the dissent argues "that only in a very rare case would an employee who is responsible for reporting illegal conduct and who reports such conduct through normal channels, be able to prove that the report was made for the purpose of exposing an illegality." Indeed, we do not disagree with the dissent that "even when an employee has an obligation to make a report because of his job duties, that report should be protected if, but only if, the employee is able to prove the report was not merely routine but, instead, was made in good faith with the contemporaneous purpose of 'blowing the whistle.'" Whether an employee makes a report for purposes of exposing an illegality will usually present a question of fact and requires examination on a case-by-case basis. We discuss the recipient of the report merely to provide an example of one way in which an employee whose job requires the reporting of illegal behavior might be able to create a fact question as to her purpose in making her report.

ployee's purpose in making a report. Kidwell testified that. as in-house general counsel he was "responsible for providing advice on any legal affairs of the company." Kidwell was performing this function when he made the report at issue here—the "Difficult Duty" email. Kidwell's purpose, as reflected in the email, was to warn his client that it would be subject to "sanction[s]" and "exposed to liability" under the Federal Rules of Civil Procedure and federal statute if it did not comply with its discovery obligations. In his email, Kidwell states that he is raising the obstruction of justice issue to the management team because of his position as the "attorney of record" in the pending intellectual property litigation. The email then recites facts and sets out legal standards under which the company's conduct could be considered unlawful. It finally states that Kidwell intends to make a future report to appropriate authorities if the company refuses to comply with its legal obligations. The text of the email thus confirms that Kidwell's purpose was not to "expose an illegality," but was to provide legal advice to his client.[9] *Obst*, 614 N.W.2d at 202.

The other evidence Kidwell offered at trial further establishes that he sent the email as part of his normal job duties as in-house counsel. Kidwell testified at trial that he sent the email "[b]ecause I hoped we could pull this company back into compliance ... and as the person responsible for the legal affairs of the company, that's what I had to do." This testimony confirms that this case falls within the first situation described above in *Huffman*,

where an employee, with a specific assignment for ensuring legal compliance, discovers and reports a potential problem to his client. 263 F.3d at 1352.

Kidwell did not offer any other evidence from which the jury could conclude that his purpose in sending the email was anything other than the performance of his assigned responsibilities as in-house counsel. For example, the record establishes that all of the identified recipients of the "Difficult Duty" email were officials on the management team at Sybaritic with whom Kidwell had previously discussed legal matters. *Cf. Huffman*, 263 F.3d at 1354 (listing as protected conduct a report by "a law enforcement officer who is responsible for investigating crime by government employees who, feeling that the normal chain of command is unresponsive, reports wrongdoing outside normal channels"). The dissent states that Kidwell sent the "Difficulty Duty" email to "most of the Sybaritic management team" and the dissent contends "there was no prior occasion where Kidwell had made a report to the management team as a whole." Therefore, the dissent contends, the "Difficult Duty" email was not sent in the performance of Kidwell's job duties. But Kidwell did not so testify at trial.[10]

During his testimony, Kidwell was not even sure to whom he had sent the email. The text of the email shows to whom it was sent and Kidwell confirmed in his testimony that all of the people to whom he addressed the "Difficult Duty" email, people he described as "management," were all people with whom he had previ-

---

9. The dissent contends that our "analytical approach" to the "Difficult Duty" email is "incongruous." We disagree. We do not suggest that the text of the email is not relevant to the question of good faith. To the contrary, the text of the email establishes that Kidwell sent it not to "blow the whistle," but to carry out his job duties.

10. The dissent's speculation that Kidwell's purpose must have been to "blow the whistle," because Sybaritic had outside counsel likewise finds no actual evidentiary support in the record.

ously discussed legal matters. Given that Kidwell addressed the email only to those in the management with whom he discussed other legal matters, no inference can be drawn that his purpose was other than to do his job, or in Kidwell's words: "to pull this company back into compliance . . . and as the person responsible for the legal affairs of the company, that's what I had to do."

Kidwell threatened in the email that if his email did not "get the company into compliance, I was stating my intention— clear intentions to make reports to the appropriate authorities." But Kidwell presented no evidence that he sent the email to law enforcement or to the government. Kidwell did forward a copy of the email to one person outside his client's chain of command—his father. But Kidwell did not send the email to his father because the normal chain of command would not be effective. *See Huffman*, 263 F.3d at 1354. Kidwell testified that he forwarded the email to his father because he had discussed "the ethical dilemma" he felt he faced with his father, "and wanted him to know what I had elected to do." The fact that he copied his father on the email therefore does not support the inference that Kidwell was blowing the whistle on his client.[11]

In sum, the jury received the "Difficult Duty" email and Kidwell's testimony about the email. This evidence, which came from the party with the burden of proof and which is uncontradicted, is "practically conclusive" that Kidwell sent the email because he felt it was his job to do so. *See Rettman*, 354 N.W.2d at 429. Indeed, Kidwell said at trial that the type of advice he gave in the "Difficult Duty" email was "what lawyers do." We agree. When in-house counsel sends his client written advice in order to "pull" that client "back into compliance," as Kidwell said he did in this case, the lawyer is not sending a report for the purpose of *exposing* an illegality and the lawyer is not blowing the whistle.[12]

Because Kidwell presented no evidence from which a reasonable jury could find that he engaged in protected conduct, we hold that the district court should have granted Sybaritic's motion for judgment as a matter of law. This decision makes it unnecessary for us to reach the other issues raised in this appeal.

Affirmed.

MAGNUSON, Chief Justice (concurring).

I concur in the result reached in the opinion authored by Justice Gildea that Kidwell cannot recover in this case, but do

---

11. Likewise, the fact that Kidwell researched whistleblower law does not support an inference that his purpose in sending the email was to expose an illegality, as the dissent contends. Kidwell researched whistleblower law to determine "what legal protections" he might have had if he sent the email. But the whistleblower statute was designed to protect those who make reports " 'for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower.' " *Obst*, 614 N.W.2d at 200 (quoting *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 484 n. 1 (Minn. 1996)). Thus, the fact that Kidwell was thinking about protecting his own interests does not support the conclusion that he sent the email to expose an illegality.

12. Kidwell argues that grounding a result in this case on the fact that he was performing the functions of a lawyer has the effect of adding an attorney exception to the whistleblower statute. We agree with Kidwell that the legislature did not write an exception in the statute for lawyers. But the legislature did require that reports, in order to be protected, be made for the purpose of exposing an illegality. *See Obst*, 614 N.W.2d at 202. Kidwell did not offer any evidence to support his claim that he made such a report.

so on different grounds. In my opinion, Kidwell's breach of fiduciary duty bars his claim.

Whether and to what extent lawyers, particularly in-house lawyers, may pursue retaliatory discharge claims is a topic that has generated significant case law and scholarly discussion. *See, e.g.,* Alex B. Long, *Retaliatory Discharge and the Ethical Rules Governing Attorneys,* 79 U. Colo. L. Rev. 1043, 1050 nn. 38–44 (2008) (collecting cases); Kim T. Vu, *Conscripting Attorneys To Battle Corporate Fraud Without Shields or Armor? Reconsidering Retaliatory Discharge in Light of Sarbanes–Oxley,* 105 Mich. L. Rev. 209, 215–18 (2006) (discussing the varying approaches that courts in different jurisdictions have taken to retaliatory discharge claims brought by attorneys). In the nearly 20 years since the Illinois Supreme Court held in *Balla v. Gambro, Inc.,* 145 Ill.2d 492, 164 Ill.Dec. 892, 584 N.E.2d 104, 110 (1991), that in-house lawyers may not pursue whistleblower claims, courts across the country have grappled with the issue. A majority of those decisions and most of the legal commentary support whistleblower status for attorneys, but that view is not uniform. *Compare* Long, *supra,* at 1080–99 (supporting a broad right to attorney whistleblower claims), *and* Vu, *supra,* at 215 (advocating the use of Sarbanes–Oxley as a vehicle for attorneys to bring wrongful discharge claims), *with* John R. Webb & J. Chris Kinsman, *Wrongful Discharge Suits by In–House Counsel: Refining the* General Dynamics *Standard,* 11 Lab. Law. 35, 36 (1995) (explaining the authors' view that "wrongful discharge claims by in-house counsel have negative consequences for the legal profession and the public").

Lawyers have special fiduciary obligations to their clients, and in-house lawyers have responsibilities to their employers that employees in other fields do not.

In considering the applicability of the whistleblower statute to lawyers, we must keep those special obligations in mind. Sound public policy principles underlie the whistleblower statute, but those public policy principles do not trump the public policy behind the fiduciary obligations that lawyers owe to clients.

Justice Cardozo said that "[m]embership in the bar is a privilege burdened with conditions." *In re Rouss,* 221 N.Y. 81, 116 N.E. 782, 783 (N.Y.1917). Lawyers have obligations to counsel their clients and to keep confidences. Minn. R. Prof. Conduct 1.2, 1.6. The client has the right to decline to follow the lawyer's legal advice, no matter how strongly the lawyer feels about the advice. *See* Minn. R. Prof. Conduct 1.2. A lawyer who disagrees with his or her client's conduct can withdraw from representation, but cannot force the client to act consistently with the lawyer's advice. Minn. R. Prof. Conduct 1.16. Nor in most situations may the lawyer disclose the client's confidences after the client chooses to proceed with the conduct that the lawyer has discouraged. *See* Minn. R. Prof. Conduct 1.6.

The Rules of Professional Conduct recognize only a few narrow circumstances in which lawyers can act beyond the limits imposed by the relationship of trust and confidence. The Rules permit disclosure of confidences only to prevent commission of a crime or to prevent death or substantial bodily harm to a third party, or to prevent purely economic harm if the lawyer's services have been used to effect that harm. *See id.* The only other narrow exception allows the lawyer to disclose a client's confidences and secrets to defend against a claim by the client or establish a claim against the client. *Id.* The American Bar Association Committee on Ethics and Professional Responsibility has expressed its opinion that a lawyer may disclose con-

fidences in order to establish a whistleblower claim against a former client. But even in a whistleblower case, a lawyer does not have complete freedom to reveal client confidences and secrets:

> The Model Rules do not prevent an in-house lawyer from pursuing a suit for retaliatory discharge when a lawyer was discharged for complying with her ethical obligations. An in-house lawyer pursuing a wrongful discharge claim must comply with her duty of confidentiality to her former client and may reveal information *to the extent necessary* to establish her claim against her employer. The lawyer must take reasonable affirmative steps, however, to *avoid unnecessary disclosure* and limit the information revealed.

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 01–424 (2001) (emphasis added).

Minnesota Statutes § 181.932 (2008) contains no exception that excludes lawyers from the class of employees who may seek the statute's protection. But the statute does not trump our power and responsibility to regulate the bar, particularly in matters of ethics. Our exclusive duty to protect the rights of clients through regulation of the practice of law requires us to consider factors beyond the language of the statute in this case. *Cf. Irwin v. Surdyk's Liquor*, 599 N.W.2d 132, 140 (Minn.1999) (explaining that this court, and not the legislature, has exclusive regulatory authority over the attorney-client relationship). *See generally Minneapolis Star and Tribune Co. v. Hous. and Redevelopment Auth.*, 246 N.W.2d 448, 452 (Minn.1976) ("[The] long-accepted theory protecting the attorney-client relationship is as basic to our legal system as the right of the judiciary to regulate and oversee the administration of that legal system.").

A lawyer may bring a whistleblower claim, but he or she is not thereby relieved of the fiduciary obligations imposed by the Rules of Professional Conduct, either before or after the claim is brought. Any disclosures of client confidences must be within the strict confines of the Rules of Professional Conduct. I would therefore hold that when a lawyer breaches his or her fiduciary duty to the client, the client has an absolute right to terminate the attorney-client relationship. And that right cannot be burdened by any claim from the lawyer for compensation or other damages. *See Lawler v. Dunn*, 145 Minn. 281, 284, 176 N.W. 989, 990 (1920) ("[Because] the client has the right to terminate the relation of attorney and client at any time[,] ... it follows as a natural consequence that [the client] cannot be compelled to pay damages for exercising that right ...."); *cf. Perl v. St. Paul Fire and Marine Ins. Co.*, 345 N.W.2d 209, 212 (Minn.1984) ("The law treats a client's right to an attorney's loyalty as a kind of 'absolute' right in the sense that if the attorney breaches his or her fiduciary duty to the client, the client is deemed injured even if no actual loss results."); *Rice v. Perl*, 320 N.W.2d 407, 411 (Minn.1982) (holding that an attorney who breaches a fiduciary duty to a client forfeits his right to compensation without any requirement that the client prove actual harm). *But see Gilchrist v. Perl*, 387 N.W.2d 412, 417 (Minn.1986) (authorizing only partial forfeiture of previously earned fees when there is no bad faith involved, no actual harm to the client and "particularly where there are multiple potential plaintiffs"). In the context of this case, I would hold that Kidwell's breach of his fiduciary duty forfeited any right he might have to recover damages or fees and costs under the statute.

The district court correctly found as a matter of law that Kidwell had breached

his fiduciary duty to the client by disclosing client confidences outside of the authorization of Minn. R. Prof. Conduct 1.6(b)(8). Nonetheless, the district court refused to rule that the breach barred Kidwell's whistleblower claim. It submitted to the jury a question concerning the damages, if any, that Sybaritic suffered as a result of Kidwell's breach. But when a lawyer breaches a fiduciary duty to the client, the question of whether the client is actually damaged or not is irrelevant to the continuation of the relationship because "the client is deemed injured even if no actual loss results." *Perl*, 345 N.W.2d at 212. The resolution I would reach protects the fiduciary obligations a client is owed by an attorney even when the client cannot prove a monetary loss as a result of that breach.

A contrary holding, allowing a lawyer's whistleblower claim to trump the lawyer's fiduciary obligations to the client, would amount to what one commentator has called "a further slide down the slippery slope on which our profession has been riding—away from the ideals of zealous client representation, based upon the bedrock principle of clients' absolute confidence in their attorneys' duty of confidentiality." C. Evan Stewart, *In–House Counsel as Whistleblower: A Rat Without a Remedy?*, 240 N.Y. L.J. 24, (col. 3) (Aug. 21, 2008) (arguing that in-house lawyers should only be able to maintain whistleblower claims subject to compliance with ethical obligations to their clients). Because Kidwell breached his fiduciary obligations to his client, in my opinion he forfeited his right to recovery.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. The plurality has adopted a legal rule that I am unable to reconcile with the language of the Minnesota Whistleblower Act, Minn.Stat. § 181.932 (2008). The plurality's legal rule imposes an artificial evidentiary hurdle on proving mental state and fails to give proper deference to the jury's determination of subjective intent. As a consequence, the plurality unnecessarily complicates whistleblower law in a manner unsupported by the statutory language. Because I find no job duties exception within the language of the Minnesota Whistleblower Act and conclude that the evidence was sufficient to support the jury's finding that Brian Kidwell acted in good faith, I would reverse the court of appeals and affirm the district court.

In his concurrence, the Chief Justice reaches the same result as the plurality— he would affirm the court of appeals by overturning the jury verdict in the district court—but he does so on different grounds. Because I disagree with the analysis articulated by the concurrence, I will address the concurrence after first addressing the plurality opinion.

The Plurality:

Brian Kidwell brought a whistleblower claim under Minn.Stat. § 181.932 against Sybaritic, Inc., claiming that he was fired after sending an email that accused Sybaritic's President, Steve Daffer, of intentionally withholding discovery in litigation the company was involved in as a defendant. At the time he sent the email, Kidwell was serving as Sybaritic's in-house counsel, and his job duties included overseeing the company's litigation. On October 3, 2006, a Hennepin County jury returned a verdict in favor of Kidwell. After hearing 5 days of testimony, the jury specifically found that Kidwell had made a good faith report and that Sybaritic fired him as a result of that report. Following the jury verdict, Sybaritic made a motion for a Judgment as a Matter of Law (JMOL), which motion the district court denied.

On appeal, Sybaritic argues that the district court erred in denying its JMOL motion. Sybaritic argues that Kidwell's disclosure was not a protected report under the Whistleblower Act because his disclosure (a) fell within his job duties, and/or (b) violated the attorney-client relationship.

The plurality looks to the plain language of the Whistleblower Act and concludes that nothing in the plain language of the act creates a blanket job duties exclusion to the act. *Supra* at 13. I agree with the plurality that the Whistleblower Act contains no plain language that would prevent a disclosure made in the course of job duties from being protected. The Whistleblower Act states that an employer shall not discharge an employee because the employee "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer." Minn.Stat. § 181.932 subd. 1(1). We have previously interpreted what the legislature meant by a report made in "good faith." In *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn. 2000), we stated that in determining whether a report was made in good faith it is necessary to look beyond the content of the report and consider the employee's purpose in making the report. To be made in good faith, a report must be made "for the purpose of blowing the whistle, i.e. to expose an illegality." *Id.*[1] Like the plurality, I conclude that if a report is made in good faith, it meets the requirements of the statute. I also agree that "an examination of the employee's job duties could be helpful in answering" the question of whether a specific report was made in good faith. *Supra* at 14. But I disagree with the plurality's reliance on *Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341 (Fed.Cir.2001), and as a result disagree with the standard the plurality would adopt from that case.

After acknowledging that an employee's job duties might illuminate the issue of good faith, the plurality cites *Huffman* for the proposition that an employee who "has, as part of his normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and, in fact, reports that wrongdoing through normal channels" has not engaged in conduct under the federal whistleblower protection act. *Supra* at 16 (citing *Huffman*, 263 F.3d at 1352). The plurality then concludes that "[t]he same is true under our whistleblower statute." *Id.*

But the plurality has not demonstrated why the conclusion reached in *Huffman* applies based on the language of Minnesota's Whistleblower Act. In *Huffman*, the Federal Circuit Court of Appeals found the language of the federal Whistleblower Protection Act (WPA) to be "ambiguous as to whether normal duties reports are covered." *Huffman*, 263 F.3d at 1352. As a result, the federal court looked to the "core purposes" and the general framework of the WPA and concluded that an employee was barred from asserting a whistleblower claim where a duty to make the report fell within the scope of the employee's job and the report was made through normal channels. *Id.* at 1352–53.

---

**1.** The plurality appears to cite *Obst* for the proposition that an employee responsible for investigating and reporting illegal conduct cannot use a report of that conduct as evidence of subjective intent to blow the whistle. *Supra* at 13–14. We did not reach this conclusion in *Obst*. Rather, we concluded that an employee's report must have been made in good faith, meaning for the purpose of exposing an illegality. *Obst*, 614 N.W.2d at 202. Further, we concluded that in determining good faith we look both to the content of the report and to other evidence of the employee's purpose in making the report. *Id.*

Here, the plurality has not found Minnesota's statutory language ambiguous. The plurality also has not compared the core purposes and framework of the Minnesota Whistleblower Act to the federal WPA to determine whether the same rationale applies. In comparing the two statutes, some differences between the acts become readily apparent. For example, the federal WPA is a statute pertaining only to a limited group of employees—certain federal employees, *see* 5 U.S.C. § 1221(a) (2006) (citing 5 U.S.C. § 2302 (2008)), whereas the Minnesota Whistleblower Act is a law of general applicability that applies to nearly every employee in the state, *see* Minn.Stat. § 181.931, subds. 2 & 3 (2008) (defining an employee as a person who performs services for hire for an employer and an employer as any person having one or more employees, but excluding independent contractors from the definition of employees). Further, the language of the two statutes is not identical. Under the federal WPA, a protected report is one that essentially concerns,

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. . . .

5 U.S.C. § 2302(b)(8); *see also* 5 U.S.C. § 1221(e). The Minnesota Whistleblower Act prohibits retaliation when,

[An] employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

Minn.Stat. § 181.932 subd. 1(1) (2008). The language in the two statutes contains differences that the plurality has not addressed or considered before applying the *Huffman* test to this case. It is unclear to me why the plurality adopts the *Huffman* approach, especially when the plurality does so without comparing the language of the applicable statutes or looking at legislative history.

The plurality also fails to adequately address approaches taken by other state and federal courts, which have adopted a variety of responses to the question of a job duties exception. Several states have addressed the issue before us. For example, a Texas appellate court dismissed the logic of *Huffman* based largely on the absence of legislative history similar to the legislative history relied on by federal court in *Huffman*. *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 276 (Tex.App.2002). The Texas court relied on the language of the state statute, as well as prior Texas precedent, in holding that an employee could recover under Texas's whistleblower provision when making a report within the scope of the employee's job duties. *Id.*[2]

2. I disagree with plurality's characterization of the holding in *Rogers*. The plurality states that the Texas statute at issue in *Rogers* protects only reports made to law enforcement agencies and not reports made to employers, and the plurality goes on to assert that "[i]t was precisely because of the unique provisions in the Texas statute that the *Rogers* court did not follow the *Huffman* analysis." *Supra* at 15 n. 6. It is true that the Texas statute at issue in *Rogers* does not protect reports made to employers, and in *Rogers* an employee was ordered by his supervisor to make a report, which happened to discuss a violation of law. *Rogers*, 89 S.W.3d at 272–75. The plurality writes as if the fact that this report was made to an employer was the key factor upon which the *Rogers* court relied in declining to follow *Huffman*. This is not the case. Rather, as I point out above, the *Rogers*

On the other hand, an Ohio appellate court considered the *Huffman* approach, as well as the Minnesota Court of Appeals' opinion in this case, before concluding that a supervisory employee did not make a protected report because she was performing her job. *Haddox v. Ohio Att'y Gen.*, No. 07AP–857, 2008 WL 3918077, at *9–10 (Ohio Ct.App., Aug. 26, 2008).

Numerous federal laws contain whistleblower provisions, and federal courts treat reports made in the scope of job duties differently depending on the statutory scheme in which the whistleblower provision is found. For example, the Sixth Circuit has held that under the whistleblower provision in the Federal Claims Act, a job duty report could be a protected report if the employee proved the employer was put on notice that the employee was engaging in protected activity. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567–68 (6th Cir.2003) (noting that the employee " 'took no steps to put defendants on notice' " that the employee was acting to further a FCA action) (quoting *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.1996)). That same court has applied the *Huffman* approach to the whistleblower provisions in the Clean Air Act, Solid Waste Disposal Act, and the Federal Water Pollution Control Act. *Sassé v. U.S. Dep't of Labor*, 409 F.3d 773, 780 (6th Cir.2005).

The Energy Reorganization Act's whistleblower provision has been held to apply to internal safety reports made by quality control inspectors. *See Mackowiak v. Univ. Nuclear Sys.*, 735 F.2d 1159, 1162–63 (9th Cir.1984). Likewise, the whistleblower protection provided in the Mine Safety and Health Act is triggered by internal safety complaints. *Donovan v. Stafford Constr. Co.*, 732 F.2d 954, 960

(D.C.Cir.1984) (citing *Phillips v. Interior Bd. of Mine Operations Appeals*, 500 F.2d 772, 783 (D.C.Cir.1974)). Most relevant to Kidwell's case, administrative decisions have also held that an in-house attorney does not need to go outside her normal job duties to be protected from retaliation for reporting an illegality under the Sarbanes–Oxley Act. *E.g., In re Leznik v. Nektar Therapeutics, Inc.*, No.2006–SOX–00093, 2007 WL 5596626, at *5–6 (U.S. Dept. of Labor, Nov. 16, 2007).

In Minnesota, we must consider the specific language used in the Minnesota Whistleblower Act to determine how job duties affect an employee's report of an illegality. Looking at the specific language of our whistleblower statute, and at the case law interpreting that statute, I find no support for the plurality's adoption of the *Huffman* test. Moreover, I fail to see the wisdom or necessity for the rule advocated for by the plurality. In applying *Huffman*, the plurality concludes that an employee acting within the scope of his job duties can only in a very rare case possess the subjective purpose of exposing an illegality unless he presents evidence that he reported the illegality through channels other than the normal channels. I have two primary objections to this conclusion. First, I fail to see why the scope an employee's job duties or the particular channel through which the employee makes his report is entirely dispositive of the employee's subjective intent. While such evidence is certainly relevant, I do not understand how the plurality concludes that this information is, alone, dispositive of good faith. Second, I am concerned by the plurality's willingness to wade into an issue of fact—subjective intent—traditionally and wisely reserved for the jury.

court relied on legislative history and prece-

dent in declining to adopt the *Huffman* rule.

The plurality appears to indicate that only in a very rare case would an employee who is responsible for reporting illegal conduct and who reports such conduct through normal channels, be able to prove that the report was made for the purpose of exposing an illegality. I disagree. Rather, an employee could make a report that is within the scope of his job duties, and could report to supervisors to whom the employee typically reports, yet nonetheless the nature of the report may indicate the employee had a subjective intent to "blow the whistle."

For example, it is conceivable that an employee responsible for company compliance, with a job duty to report violations of law to a company board, could discover an illegality that is perpetuated by a highly powerful member of the company and is profitable for the company. That employee may face a decision to: (a) make the obligated job duty report and face a high risk of termination, or (b) turn a blind eye to the illegality, not make the obligated report, and, as a result, keep his job. *Obst* requires a plaintiff asserting a whistleblower claim to prove that any report was made in good faith, i.e. for the purpose of exposing an illegality. 614 N.W.2d at 202. I cannot conclude, as a matter of law, that an employee who chose the first option in the above scenario could *never* have the subjective intent required by *Obst*.[3] It is entirely plausible that a desire to "blow the whistle" or to expose an illegality may be the very fact that drives the employee to face the risk of termination and make the report. Moreover, encouraging employees in difficult situations to make the report—to expose the illegality rather than cover it up—is precisely the purpose of the Whistleblower Act.

The plurality's rule imposes an arbitrary evidentiary hurdle on proving mental state—that the channel through which the report is made is somehow dispositive of the employee's mental state. The rule is logically analogous to ruling that a jury cannot reasonably ever find that a murder suspect acted with premeditation unless the State presented evidence that the suspect drew a map to the victim's house. Just as a map is evidence of but not dispositive of a murderer's mental state, so, too, here, the particular channel chosen by Kidwell to blow the whistle is not dispositive of his mental state.

The plurality also encroaches on the well-established role of the jury in determining subjective intent. When a party bears the burden of proving the mental state of himself or another person, he is free to do so using any relevant, competent, admissible evidence—direct or circumstantial. When a jury, based on a preponderance of the evidence, concludes that a person acted with a given subjective mental state—as the jury did here—the jury determination is entitled to deference of the highest degree.

Mens rea is the particular province of the jury because it is elusive as well as

---

3. In fact, *Obst* itself concerned a quality assurance manager who worked for Microtron, a manufacturer of electronic components for the automobile industry. 614 N.W.2d at 198. Obst's claim was based on a report in which Obst stated that Microtron was not manufacturing a specific product according customer-approved procedure and Microtron needed to reveal that failure to the customer. *Id.* at 198–99. Obst made that report during regular meetings designed to address the problems with the product. *Id.* at 199. In *Obst,* we concluded that Obst did not have the requisite good faith when he made the report. *Id.* at 202–03. But we did not reach this conclusion because it was Obst's job duty to monitor quality compliance. Rather, our conclusion was based on the fact that the only illegality Obst claimed to have reported was widely known to all parties involved. *Id.* at 202–203.

subjective, and all but invariably is determined by drawing from objective facts—which may be inconsistent, fraught with ambiguity or both—inferences about a subjective matter that are informed by human experience.

*People v. Fernandez,* 64 A.D.3d 307, 879 N.Y.S.2d 74 (N.Y.App.Div.2009); *see also State v. Chambers,* 507 N.W.2d 237, 239 (Minn.1993) (" 'Though a subjective state of mind may at times be difficult to determine, there is no mystery to mens rea, the latinism notwithstanding. Jurors in their every day lives constantly make judgments on whether the conduct of others was intentional or accidental, premeditated or not.... [T]he factfinder can do this too; indeed, it is the factfinder's job to do it....' ") (quoting *State v. Provost,* 490 N.W.2d 93, 101–02 (Minn.1992)). By establishing a legal rule that tethers a whistleblower's subjective mental state to the methods he uses to blow the whistle, the plurality ignores these important principles.

That is not to say that every report made by an employee in a compliance position is or should be a protected report. An employee in a compliance position may make many routine reports which reveal possible illegalities, but which do not suggest the employee has the purpose of blowing the whistle. *Obst* requires an employee asserting a whistleblower claim to prove that any report was made in good faith and for the purpose of exposing an illegality. *Id.* at 202. The fact finder is already charged with determining whether

the evidence supports the finding of such a purpose. *Id.* Thus, even when an employee has an obligation to make a report because of his job duties, that report should be protected if, but only if, the employee is able to prove the report was not merely routine but, instead, was made in good faith with the contemporaneous purpose of "blowing the whistle."[4] *See id.*

In Kidwell's case, the jury concluded that Kidwell had made a protected report. The jury was specifically instructed by the district court that for a report to be protected it must, among other things, be made in good faith. The court told the jury that a good faith report is one which the employee made with a purpose "to 'blow the whistle' for the purpose of exposing an illegality, that is a violation of federal, state, or local law." The court also told that jury that "[t]o determine whether a report was made in good faith, you must look not only at the content of the report, but also at Mr. Kidwell's job and purpose in making the report at the time the report was made, not after subsequent events transpired." Based on these instructions, and the evidence presented in the case, the jury concluded that Kidwell had made a good faith report that was protected by the Minnesota Whistleblower Act.

Sybaritic now asks our court to overturn that jury verdict and issue a JMOL in its favor. When a district court considers a motion for JMOL, "it must determine whether, viewing the evidence in the light most favorable to the nonmoving party, the verdict is manifestly against the entire

---

**4.** Although the plurality does not reach the issue, Sybaritic also argues that an in-house attorney should be precluded from asserting a whistleblower claim based on the attorney's professional responsibilities. The Minnesota Whistleblower Act contains no such exclusion and the overwhelming plurality of jurisdictions have rejected such claims based on rules identical to Rule 1.6 of Minnesota's Rules of

Professional Conduct. *See Heckman v. Zurich Holding Co. of Am.,* 242 F.R.D. 606, 608–09 (D.Kan.2007) (listing at least ten courts that have disagreed with *Balla* and then joining the plurality of jurisdictions in rejecting *Balla* ). I would join the growing plurality of jurisdictions that conclude the Rules of Professional Responsibility do not bar such claims.

evidence or whether despite the jury's findings of fact the moving party is entitled judgment (sic) as a matter of law." *Obst,* 614 N.W.2d at 199 (quoting *Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998)). On appeal, we review the district court's decision de novo. *Id.* (quoting *Pouliot,* 582 N.W.2d at 224). We do not set aside the jury verdict unless the evidence, when viewed in the light most favorable to the verdict, " 'is practically conclusive against the verdict.' " *Id.* at 200 (quoting *Pouliot,* 582 N.W.2d at 224).

Viewing the evidence in the light most favorable to the jury's verdict, there is more than sufficient evidence to conclude that Kidwell's report—the "Difficult Duty" email—was not merely a routine report but instead was made with the intention of "blowing the whistle." Kidwell began the "A Difficult Duty" email stating that, "I write to you all with deep regret, but I cannot fail to write this email without also failing to do my duty to the company and to my profession as an attorney. That I will not do."

In the email, Kidwell expressed concern about a "pervasive culture of dishonesty" at Sybaritic and then proceeded to set forth specific illegalities that concerned him. Kidwell concluded the email writing that,

> It is my firm conviction that Sybaritic intends to continue to engage in tax evasion, the unauthorized practice of medicine and obstruction of justice. Accordingly, it is my intention to advise the appropriate authorities of these facts. I do this with no ill-will. To the contrary, I wish that I was not obliged to do so. However, the demand of Sybaritic that I become attorney of record in the [intellectual property action] has made it impossible to ignore the obstruction of justice issue, and compels me to speak out about the tax evasion and unauthorized

practice of medicine issues which the company has refused to address. I regret that I see no other course of action available.

The plurality appears to conclude that when an employee who has the responsibility to report illegal behavior makes a report of such behavior, that employee will need evidence other than the report itself to prove subjective intent to blow the whistle. In other words, the plurality apparently concludes that Kidwell cannot prove his good faith solely through the "Difficult Duty" email. But the plurality analyzes the "Difficult Duty" email in an effort to find evidence of Kidwell's *lack* of good faith. I find this analytical approach incongruous. I conclude that a jury can look to the report itself or to other evidence to find good faith. And here, while the contents of the "Difficult Duty" email are not in dispute, what those contents evince is the key question. Moreover, it is a question for a jury to answer, and not for our court to answer on appellate review.

Further, there is more evidence than the "Difficult Duty" email upon which the jury may have based its verdict. Kidwell sent the "Difficult Duty" email to most of the Sybaritic management team. A review of Kidwell's prior work suggests that he typically informed one or two members of the management team when he had legal compliance issues. Based on the fact record, there was no prior occasion where Kidwell had made a report to the management team as a whole. Other circumstances that could reasonably be viewed as suggesting that the "Difficult Duty" email was not a routine report include the fact that Kidwell researched whistleblower law before writing the email, and that, according to Kidwell and his wife, the morning after the email was sent Kidwell told his wife just before leaving for work that it was possible he would be fired that day. Thus,

there is sufficient evidence for a jury to conclude that Kidwell's "Difficult Duty" email was not merely the performance of a routine job duty.

There is yet more evidence that, when viewed in the light most favorable to the jury verdict, supports a finding that Kidwell acted with the purpose of "blowing the whistle." During the trial, Kidwell testified about his decision to send the email. He explained that he reported directly to Sybaritic's President, Steve Daffer. Kidwell testified that he was aware of Daffer's past history of criminal behavior.[5] Kidwell explained that Daffer was "directing an awful lot of the decisions," so he decided to report his concerns regarding the potentially damaging emails to the other members of Sybaritic's management as well as Daffer. Kidwell explained that he believed he was ethically obligated to report his concerns, and that he spent the weekend before sending the email "weighing how and when was the appropriate time" to raise the concerns. Kidwell said the email was intended to let Sybaritic know that if the company did not come into compliance, he would have to report the illegalities to the appropriate authorities. Kidwell explained that by sending the email he "hoped that we could pull this company back into compliance by enlisting some of the other members of management, and as the person responsible for the legal affairs of the company, that's what I had to do."

Kidwell's email and testimony make it apparent that Kidwell understood that his professional responsibilities were implicated by the illegalities he suspected were taking place at Sybaritic. However, a jury could reasonably conclude that Kidwell was not motivated simply by his professional responsibilities, but that he was concerned about a "culture of dishonesty" and felt an ethical duty to "blow the whistle" on the illegalities he believed were taking place. Kidwell testified that he felt ethically obligated to make the report. Kidwell also said that he believed he would be terminated for sending the email because "the messenger with bad news has a tendency to get shot." For this reason, Kidwell said he wanted to get some advice before sending the email. Kidwell testified that he called his father, who told him to "do the right thing."

If Kidwell had only been concerned with complying with his job and professional responsibilities, he may have been able to avoid the need to personally report the suspected discovery violations in the litigation Sybaritic was involved in as a defendant. Sybaritic's outside counsel in the litigation was also concerned about possible evidence tampering. Outside counsel expressed his concern to Kidwell over possible evidence tampering and told Kidwell that he planned to write a letter to Daffer warning him about the legal consequences of any discovery violations. Kidwell could have permitted outside counsel to attempt to address the problem, in hopes that the suspected illegalities could be resolved without Kidwell's involvement. Instead, Kidwell chose to personally make the re-

---

**5.** In 1984, our court indefinitely suspended Daffer from the practice of law, with a right to apply for readmission after five years. *In re Daffer*, 344 N.W.2d 382, 383 (Minn.1984). The suspension was issued after Daffer was convicted of mail fraud in federal court. *Id.* at 383. Daffer had knowingly appropriated approximately $170,000 in funds that were accidentally deposited into his investment ac-

count. *Id.* He entered into a scheme to use the funds to generate income for himself and a partner, and in furtherance of the scheme he altered identification cards which were sent through the mail. *Id.* at 383–84. When caught, Daffer returned the funds with interest and pleaded guilty to the mail fraud charge. *Id.*

port to four members of Sybaritic management, expressing his concern about a culture of dishonesty at the company, and revealing the discovery violations along with other legal concerns Kidwell had about the company.

At trial, Sybaritic attacked Kidwell's good faith in sending the "Difficult Duty" email by questioning Kidwell on the extent to which he had verified the allegations before making them, arguing it was his job to report the concerns, and suggesting that the email was sent only to set up a whistleblower claim. After being given jury instructions that set forth the governing legal standard, the jury rejected Sybaritic's argument and returned a verdict in Kidwell's favor. Based on the evidence, it was not unreasonable for the jury to conclude that Kidwell reported the perceived discovery violation to persons beyond Daffer in order to expose the illegalities and to express his concern with an overall "culture of dishonesty" at Sybaritic. Because the evidence presented was not "practically conclusive against the verdict" for Kidwell, I conclude that our court has no basis to and should not overturn the jury verdict. *See Obst*, 614 N.W.2d at 200 (quoting *Pouliot*, 582 N.W.2d at 224).

Nonetheless, despite the fact that the jury explicitly found that Kidwell acted with the purpose of exposing illegality, the plurality is willing to cast aside the jury's considered judgment and replace the jury's verdict with its own judgment. In the process, the plurality announces a legal rule—that an employee can only in a very rare case subjectively possess the purpose of exposing illegality if he blows the whistle using "normal channels." The plurality's rule is not based in the language of the Minnesota Whistleblower Act. Significantly, the plurality's rule invades a well-established province of the jury, determining mental state, and instead establishes an arbitrary evidentiary hurdle. Because I fail to see the wisdom or the necessity of such a rule, I dissent.

The Concurrence:

In his concurrence, the Chief Justice appears to hold that, as a matter of law, Kidwell cannot be allowed to bring a whistleblower claim under Minnesota law because he emailed a copy of the "Difficult Duty" email to his father. I respectfully disagree. While the concurrence acknowledges that Minnesota's Whistleblower Act contains no exceptions for lawyers, it chooses to ignore the language of that statute in this case, and bases its result on the judiciary's role in protecting the lawyer-client relationship. But as we have said many times, "[i]t is the duty of this court to apply the law as written by the legislature." *Int'l Bhd. of Elec. Workers, Local No. 292 v. City of St. Cloud*, 765 N.W.2d 64, 68 (Minn.2009) (Magnuson, C.J., writing for a unanimous court). By crafting an exception to the Whistleblower Act without any attempt to ground the results reached in the text of the statute, the concurrence abandons its judicial role and invades the legislature's right to weigh the competing policy implications of whistleblower protections.

The concurrence employs a narrow reading of Rule 1.6 of the Minnesota Rules of Professional Conduct to support its bright-line rule that lawyers who breach a fiduciary duty are barred from bringing a whistleblower claim. The concurrence states that when a lawyer breaches a fiduciary duty, a client has an absolute right to terminate the relationship. But, Rule 1.6 specifically contemplates whistleblower claims. Rule 1.6(b)(8) states that "[a] lawyer may reveal information relating to the representation of a client if ... the lawyer reasonably believes the disclosure is necessary to establish *a claim* or defense...." Minn. R. Prof. Conduct 1.6 (emphasis add-

ed). Before 2005, Rule 1.6 of the Minnesota Rules did not contain the word "claim," referring instead to establishing a defense. Minn. R. Prof. Conduct 1.6 (2005). Rule 1.6 of the Model Rules of Professional Conduct has used the more inclusive "claim or defense" language for far longer. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. No. 01–424 (2001). At the time Minnesota adopted the new version of Rule 1.6—incorporating the "claim or defense" language—the American Bar Association's ethics opinion accompanying Rule 1.6 of the Model Rules of Professional Conduct stated that Rule 1.6 of the Model Rules allows an in-house attorney to pursue a retaliatory discharge claim, including the ability to "reveal information to the extent necessary." *See id.* Therefore, Rule 1.6 of the Minnesota Rules by its terms, specifically the "claim or defense" language, contemplates certain situations where lawyers may bring whistleblower actions against their employers. Even though a client has a right to terminate the attorney-client relationship, this does not remove an in-house attorney's right to sue under some circumstances.

In essence, the concurrence argues that Kidwell should be barred from maintaining a claim because the district court found that Kidwell breached his fiduciary duties under the rule when he emailed his father a copy of the "Difficult Duty" email. Nothing in the statute or the rule, however, supports the concurrence's bright-line rule that breaking a fiduciary duty forecloses a whistleblower claim.

Moreover, the fact that Kidwell breached his fiduciary duty was an important piece of information for the jury to consider. It was relevant in determining whether Kidwell blew the whistle in good faith and also relevant in determining whether Sybaritic's firing of Kidwell was caused by his protected conduct, rather than some other legitimate reason. As I note in my response to the plurality opinion, good faith is properly a question for the jury to answer, and, here the jury has already answered that question. Accordingly, it is not a question for our court to answer on appellate review.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

MEYER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.